STILES NICHOLS *against* EDEN RUGGLES and EDWARD
M. HOLLY.

MOTION for a new trial.

This was an action of book debt; and among other charges in the plaintiff's account, there was one of 262 dollars and 9 cents, for printing part of a book entitled " *The Federal Calculator.*" It was proved, and admitted by the parties, that before *June*, 1804, when the printing was done, one *Daniel Hawley* had obtained the exclusive copyright of the book, as author, throughout the *United States*. He had lodged the title with the clerk of the district court for *Connecticut*, as the law directs; and had assigned his copyright to one *Pennyman*, with the exclusive privilege of printing and vending the book in this state. Since that time, the plaintiff had printed the same book in *Danbury*, in this state, for which printing, the charge above mentioned was made. There was no evidence that *Hawley* had ever published in any of the papers of the *United States*, that he had obtained the copyright; nor, that he had ever deposited a copy of the book in the office of the secretary of state of the *United States*. The controverted facts in the case were, that the plaintiff, before he did the printing, knew that the copyright had been secured by *Hawley*, and assigned to *Pennyman*; and that, though the printing was done in *Connecticut*, it was with a view only for the defendants to vend the copies in *New-Jersey*. The presiding judge, in charging the jury, instructed them, that it was the opinion of the court, that if they found that the plaintiff had such knowledge, the contract was illegal, and no recovery could be had for that charge.

*A contract to reprint any literary work in violation of a copyright secured to a third person, is void; and the printer who executes such contract, with a knowledge of the rights of such third person, can recover nothing for his labour.*

*The provisions of the act of congress requiring the author or proprietor to publish the title of his book in a newspaper, and to transmit a copy of the work itself to the secretary of state, are merely directory, and constitute no part of the essential requisites for securing the copyright.*

The jury found a verdict for the defendant; and the plaintiff moved for a new trial, on the ground of a misdirection. This motion was reserved for the opinion of the nine judges.

Previous to the argument, it was suggested by the counsel for the defendants, that *Hawley*, under whom *Pennyman* claimed, had secured the copyright of the work in question, previous to the year 1802, so that, in this case, no question could arise under the act of congress made in that year, and to take effect *January* 1st, 1803 ; vol. 6. 114. a fact, which, though it did not appear upon the statement in the motion, would appear from the minutes of the judges who sat on the trial of this case at the circuit; to which, Judges *Reeve*, *Edmond*, and *Griswold* assented.

*Edwards* and *J. Law*, in support of the motion.

1. The first ground on which this motion for a new trial is founded, is, that for the printing *Nichols* ought to have recovered of *Ruggles* and *Holly*, who employed him, though it be admitted that the copyright was in *Pennyman*, and that in executing the printing, *Nichols* might have made himself liable to *Pennyman*. There must be something *immoral* in an act, in order to render it an illegal consideration for the support of a contract. The reasons why an undertaking against law is void, are, first, because the mind cannot be supposed to have given its free consent to act against duty ; secondly, because the law will not permit the performance of that which it has forbidden; nor, consequently, allow the contractor to require that performance. *Pow. Con.* 165. The immorality of the act constituting the consideration, is expressly the first reason why the contract is void, and upon examination it will be found, that the second will in no instance hold, except where the breach

June, 1808.

NICHOLS
v.
RUGGLES.

of the law, against which the act is committed, involves in it some immorality. There are a variety of positive laws, respecting which, it is said by *Blackstone*, that " the alternative is offered to every man, either to abstain from this, or submit to such a penalty;" and the same author observes, that " conscience is no farther concerned than by directing a submission to the penalty." 1 *Bl. Com.* 58. Not burying the dead in woollen, and not performing statute work on the public road, &c. are contrary to the law of *England;* yet " conscience," says the author before cited, is only concerned to submit to the penalty, if levied. Will it be contended, that no act done in contravention of such laws can furnish a legal consideration for a contract? Suppose that a man, instead of working on the public roads, should perform some important business for an employer; could he be denied all possibility of recovery for his services? We contend to the contrary, and insist, that contracts which may involve a disobedience to such laws, are, notwithstanding, legal and binding; for that, the reasons do not exist, for which certain contracts are pronounced illegal. There is, in such cases, no breach of duty, nor does the law, by any prohibition of the act, take away the power of the contractor to fulfil his agreement. The prohibition is not absolute, but only *sub modo.* Abstain from this, or submit to the penalty, is the alternative offered by the law. And in case of contracts made under such circumstances, whoever is to do that which the law has thus conditionally prohibited, must be supposed to have voluntarily submitted himself to the penalty.

In the present case, admitting that *Pennyman* had done all that was necessary, in order to secure the copyright to himself, we contend, that the law which secures to him the exclusive privilege of printing and vending, at the same time offers to every man the alternative of

abstaining from infringing that privilege, or of submitting to the penalty prescribed. *Nichols*, the printer, had in this case, to make his election, whether he would forbear to print, or subject himself to the penalty. There is nothing in the printing *malum in se*, nor is there in it any breach of law, in which the conscience is concerned; therefore, the undertaking to print, and the undertaking to pay, are binding upon the parties. The penalty prescribed by the law on this subject, is the only guard which was intended to be given for the security of authors and their assignees; nor does sound policy require any other. *Nichols*, therefore, having elected to print for *Ruggles* and *Holly*, and to incur the risk of the penalty which might be recovered by *Pennyman*, did, having executed the printing for his employers, thereby acquire an equitable and legal right to recover for his services.

2. The present motion, therefore, is grounded on the fact, that *Hawley* had not complied with the requisites of the statute, having omitted to give notice in some public newspaper, that he had purchased the copyright. This notice, given in one or more papers in the *United States*, is, as we contend, a condition, without a compliance with which, no exclusive privilege can be claimed. It does not appear that *Hawley* has complied with this condition; therefore, neither he, nor *Pennyman*, his assignee, is vested with the exclusive right of printing and vending the book in question.

3. It does not appear, that either *Hawley* or *Pennyman* are citizens of, or residents in, the *United States*; and by the statute, citizens or residents only can be entitled to the privileges therein prescribed.

4. Though the plaintiff knew of the assignment to *Pennyman*, and that *Hawley* had obtained the copyright,

it does not follow, that *Nichols* might not have had license from *Pennyman* to print; nor, that there might not have been a second assignment, either to *Nichols*, or some other person, from whom license might have been obtained.

5. *Nichols* was employed by persons who owned the copyright for the state of *New-Jersey*, and the copies were there to be disposed of. The printing, under such circumstances, was not any infringement of *Pennyman's* privilege.

6. It is by statute made the duty of him who obtains a copyright, to lodge a copy of the work with the secretary of state for the *United States*, though not expressly made a condition *sine qua non.* How is a compliance with that duty to be enforced, unless by making the security of his privilege depend upon the performance of it?

7. *Nichols*, to be barred of a recovery, should have *known* that the printing was unlawful. He might well suppose that he had a right to print for *Ruggles* and *Holly*, when the copies were to be sold in *New-Jersey.* He may be considered in the light of an officer, who has taken goods, which were pointed out to him, on a promise of indemnification. The promise to indemnify is binding, though the taking of the goods may have been unlawful. 1 *Pow. Con.* 178.

*Gould* and *Hatch*, contra.

The question, which arises upon this motion is, whether the contract between *Nichols* and the defendants is an undertaking illegal in such a sense as to render it void. We insist, that the printing was at the same time a civil injury, and a public offence; a civil injury, as being an infringement of the pro-

June, 1808.

NICHOLS
v.
RUGGLES.

prietor's copyright, and a public offence, as incurring the forfeitures of the act of congress " for the encouragement of learning," &c. (*Vide Laws of U. S. A.* vol. 1. p. 118.) If it be either a private wrong, or a crime, the contract of which it is the consideration is void.

The general rule of law, that an engagement to do a thing in itself unlawful binds not, will not be questioned. *Pow. Con.* 164. 1 *Esp. Dig.* 88. So, if the consideration, upon which a promise is made, be unlawful, the promise itself is void, although it be for the performance of an act perfectly indifferent. *Pow. Con.* 176.; *Buller's N. P.* 206. As in the case of *Webb* v. *Bishop*, where two boxed for a wager of five guineas, and on *assumpsit* brought by the winner for that sum, the action was held not to lie, the consideration of the promise being a breach of the peace. *Esp. Dig.* 88. It is, then, a correct rule, that where the undertaking is upon an unlawful consideration, or for the performance of a thing unlawful, the contract is void. And it makes no difference, whether the act to be done be *malum in se*, or only *malum prohibitum*. *Pow. Con.* 165., and cases there cited. *Ketchum* v. *Scribner*, 1 *Root*, 95. So, that there is no foundation for the position assumed by the counsel in support of the motion, that in order to render an agreement illegal, the act stipulated for must be immoral in itself.

It is argued, however, that one may lawfully undertake for the performance of an act which amounts merely to a private wrong, and that such performance may be a good consideration to support an *assumpsit*. But it is the *unlawfulness* of the thing to be done, rather than its *criminality* in legal consideration, that takes away the obligation to performance. 1 *Pow. Con.* 164.

Every act, which is prohibited by law, is unlawful, whe-
ther it be a public wrong, or merely a civil injury.

*Powell* adds elsewhere, that " if a man will take a
bond, or other security, to be saved harmless of suffer-
ing one to escape, &c., *or, if he do such a trespass*, these
contracts, upon the same principle, will be void." *Pow.
Con.* 197. Here a contract to procure the commission
of a private wrong is placed on the same footing as
one to induce the perpetration of a public offence.

There is, besides, one entire class of cases, in which
the principle for which we contend is fully recognised,
*viz.* cases of contracts, or agreements in fraud of third
persons: those are void, both at law and in equity.
A great variety of cases and authorities might be cited,
showing the intent and application of this rule; but it is
deemed sufficient to refer the court to *Parsons* v. *Thom-
son*, 1 *Bl. Rep.* 322. *Holland* v. *Palmer*, 1 *Bos. & Pull.*
95. *Willis* v. *Baldwin*, *Doug.* 433. *Jackson* v. *Duchaire*,
3 *Term Rep.* 551. *Pow. Con.* 165. 176. It cannot surely
be claimed, that there is any intrinsic quality in fraud,
in the light in which we are now viewing it, by which
it is distinguished from any other private injury. It is
not more strictly prohibited than a trespass to the per-
son or property.

Several cases have been put by the counsel in sup-
port of the motion, not analogous. Suppose I employ
one, who is a subject of military duty, to labour for me
on a day of military review, cannot he recover for the
services rendered? Suppose the servant of *A.*, in per-
forming the labour assigned him, be necessarily guilty of
a trespass, by passing the close of *B.;* will not the la-
bour done be a good consideration to support an *assump-
sit?* The answer is obvious. The consideration of the
promise in the first case is not the crime, nor, in the

June, 1808.

NICHOLS
v.
RUGGLES.

second, the tort committed, but, in each, the services rendered.

I. Whether the printing in question was a private wrong, will be determined by inquiring whether the copyright of the book belonged to the assignee of *Hawley*. The printing was undoubtedly an evasion of that right, admitting it to have existed.

On the part of the defendants, it is claimed, that *Pennyman* had an exclusive right to the book which was printed, on two grounds, *viz.* first, at common law; and, secondly, under the statute.

First, the author of any literary work had, by the common law, an exclusive right to the copy, both before and after publication; and this right is not limited or impaired by the act of congress made for the encouragement of learning, &c. *Millar* v. *Taylor*, 4 *Burr*. 2303. *Donaldsons* v. *Becket and others, Ibid.* 2408. 2 *Bl. Com.* 411., and *Christian's note*, p. 576.

It has, indeed, been holden, that the statute 8 *Ann*. c. 19. has limited or abridged the common law in this particular. In that statute is a clause, expressly providing, " that the author and his assignees shall have the sole liberty of printing and reprinting his works, for the term of fourteen years, *and no longer.*" In the statute of the *United States*, which was made at a time when the phraseology in this clause had received a judicial construction, and which, in many of its provisions, is substantially a transcript of the *English* statute, this limitation is wholly omitted. Was it, then, the intention of the legislature of the *United States* to abrogate the common law right of authors? It was, for a long time, held doubtful in *Great Britain*, whether even the statute 8 *Ann*. had this effect. It was a question, on which the ablest

judges differed. Not a single clause or expression can be pointed out, from which it can be inferred that such was the intent of the framers of our statute. " Where the common law and a statute differ, (says Judge *Blackstone,*) the common law gives place to the statute; and an old statute gives place to a new one. But this is to be understood only when the latter statute is couched in negative terms, or where its matter is so clearly repugnant, that it necessarily implies a negative." 1 *Bl. Com.* 89, 90. The matter of our statute is not even claimed to be thus repugnant to the common law. The statute merely secures the right of authors for a term, or terms, under a new sanction, and gives a new remedy for the violation of it. The statute of this state " for detecting and punishing trespasses" does as much, and might as well be construed to abrogate the common law.

Secondly, but should the opinion of the court be against the defendants upon the question, as to the common law right, still it is insisted, that *Hawley,* and of course *Pennyman*, had acquired a perfect title to the copy, under the act of congress.

The first section of the statute explicitly provides, that the author, &c. shall have the sole right and liberty of printing, &c. for the term of fourteen years from the recording the title, &c. in the clerk's office of the district court. To this provision in our statute may be applied what Justice *Yates* said in the case of *Miller* v. *Taylor,* of a similar clause in the statute of *Anne.* 8 *Ann.* c. 19. s. 1. By this clause, a sole right is positively vested in the author, during the particular terms, which the statute has limited. The subsequent provisions have, indeed, annexed penalties, and forfeitures of the sheets; but the right is wholly confined to the parties interested, the author and purchasers of copies.

To the author, therefore, it is the same as a lease, a grant, or any other common law right, whilst the term exists, and will equally entitle him to all common law remedies for the enjoyment of that right. 4 *Burr.* 2380.

The 3d section makes it an express condition, on which any person is to take benefit of the statute, that the copy of the title be deposited in the office of the district clerk, before publication. In the case now before the court, this condition has been complied with. Why, then, has not a title been acquired?

It is said, that a copy of the district clerk's record has not been published in any newspaper, nor a copy of the book delivered to the secretary of state, agreeably to the requirements of the statute. These acts, it is contended, are in the nature of conditions precedent; so that a right to any literary work under the statute cannot be acquired, except by performing them. The 4th section and the last clause of the 3d are relied on, as fortifying this position.

Upon these clauses, it would perhaps be sufficient to remark, that they are merely directory, and that neither the language in which they are couched, nor their connection with the body of the statute, authorizes the conclusion which they are cited to support. Indeed, as we have before seen, the author's right vests, at the time of depositing the title in the clerk's office; and it is nowhere expressed, that this right shall be devested by any act or omission whatever. Besides, the publication of the clerk's record, in the newspaper, may be at any time within two months from the date thereof; and the delivering of a copy to the secretary of state, at any time within six months from the publication of the book. In the mean time, the author's right is vested; his term has

commenced. What, then, is his situation? Has he no remedy for an invasion of his right?

It would surely be going too far to say that he has not; the case would suppose a wrong without a remedy.

In perfect conformity to these ideas have been the decisions of courts, and the opinions of lawyers, in *Great Britain.* Thus, though it is there made necessary, by the statute of *Anne*, in all cases, before publication, to enter the title of a book in the register's book of the company of stationers;(a) and though it is expressly provided that no one shall be made liable to the *penalty* where this is not done, yet, in such cases, it is well settled that an action may be brought, or an injunction obtained in a court of equity, against any one who violates the right of an author. 1 *Bl. Rep.* 330. 2 *Bl. Com. Christian's note*, 578. 4 *Burr.* 2380, 2381. Indeed, in this point, it is believed, a doubt cannot be entertained.

2. But, we contend further, that the printing which *Nichols* claims to have done, was a crime, inasmuch as it incurred the forfeitures of the statute. The clause in which the forfeiture is prescribed, is in these words. [Here the counsel read the second section down to the words " *shall forfeit,*" &c. inclusively.] Here it is observable, that not the most distant allusion is made to the lodging of a copy in the office of the secretary of state, as a condition on which the forfeitures are given. But the statute does speak of *publishing* the clerk's record; it prescribes the forfeiture to be incurred by those persons who infringe an author's right, after the record-

(a) By a late statute, it is required, that the whole book, and every volume thereof, be lodged as above mentioned. *Stat.* 15 *Geo.* III. c. 53. s. 6.

ing the title, &c. and *publishing the same*. The expressions here used have been thought to countenance the idea, that at least, the publishing a copy of the clerk's record, is an indispensable condition. But if we look back to the first section, to which the phrase " publishing the same *as aforesaid*," must refer, we shall find, that the only case in which publishing the record is made necessary, is where second terms are sought to be secured. The right of an author is to be protected for a further term, provided he not only record his title a second time, but publish the record, as is elsewhere directed.

This, then, is the publishing, of which the statute here speaks. The clause which prescribes the forfeiture is general, and meant to embrace each of the cases, in which a copyright is supposed to be secured, *viz.* cases both of first and second terms. Publishing the record is made necessary, as we have seen, in one class of these cases; and hence this language, in the 2d section, came necessarily to be used.

If this reasoning be correct, the printing, by *Nichols*, incurred the forfeitures of the statute, and was, of course, a crime.

But other questions have been raised in the course of the argument, some of which were not expected to be agitated here; because they were not supposed to arise out of the allegations in the motion, or the facts that came out upon the trial at the circuit.

1. It is said that it does not appear whether *Penny-man*, or *Hawley*, be a citizen of the *United States*, or resident within the same, or that *Nichols*, in printing, might not have acted under a license, or authority derived from the proprietor. To these suggestions, it

is sufficient to answer, that the motion does not allege any misdirection on these points, as a cause for a new trial; nor was there, in fact, any. The statement in the motion cannot be supposed to present a complete history of the case; but it will be intended to be so far perfect, as to raise every question meant to be tried.

2. It is also urged that the printing was lawful, because, though done here, the books were to have been sold in *New-Jersey*. To this point is cited the case of *Hudson & Goodwin* v. *Patten*, 1 *Root*, 133. This was an action brought upon the statute of this state, and the only question raised in the case was, whether vending in *Connecticut*, under the circumstances, was a violation of the right of the plaintiffs. The court held that it was, and accepted the verdict on that ground. This case is in point to shew that the penalties of the statute are incurred, by the bare act of vending; and, consequently, by the bare act of printing. It establishes, therefore, precisely, the negative of the proposition which it is cited to support. And that printing alone incurs the forfeitures of the statute, is settled by the plainest language, and by a long course of uniform decisions.

3. But it is said further, that *Nichols* might not have known that the printing was unlawful; and an attempt is made to assimilate his case to that of a sheriff, who levies an execution upon property supposed to belong, but not in fact belonging, to the debtor, by direction of the creditor, under a promise of indemnification. The two cases, however, are distinguishable in this material point, viz. that in one case, ignorance of fact is supposed; in the other, ignorance of law merely. The sheriff is ignorant that the articles levied on are the property of a stranger; *Nichols* is found by the jury, under the direction of the court, to have had know-

June, 1808.   ledge of all the facts, which went to prove the right of
———           *Pennyman.* The ignorance assumed in his justification
NICHOLS       is, therefore, a mere ignorance of law. No case can
v.            be found in the books, where a bond or promise of in-
RUGGLES.      demnity to the sheriff, for a wilful trespass, has been
              holden good.

BY THE COURT, SWIFT and SMITH, Js. dissenting.
A contract to reprint any literary work, the copyright to
which has been secured to the author, is void, unless it
is entered into with the consent of the author, or his
assignee. And the printer who executes the contract
with a knowledge of the rights of the author, can reco-
ver nothing for his labour.

The provisions of the statute, which require the
author to publish the title of his book in a newspaper,
and to deliver a copy of the work itself to the secretary
of state, are merely directory, and constitute no part of
the essential requisites for securing the copyright. The
publication in the newspaper is intended as legal notice
of the rights secured to the author, but cannot be ne-
cessary, where actual notice is brought home to the
party, as in this case. The copy to be delivered to the
secretary of state, appears to be designed for public
purposes, and has no connection with the copyright.

Nor can the intent with which the work is reprinted,
be taken into consideration, as the act of reprinting is
expressly prohibited by the statute. And as it appears
in this case, that the plaintiff reprinted the " *Federal
Calculator*" after the copyright had been secured, and
with actual notice of the fact, he could recover nothing
on that account, and the charge of the court to the jury
was correct.

New trial not to be granted.