WHEATON (MILLER v.). See Case No. 9.-595.

---

## Case No. 17,486.

### WHEATON et al. v. PETERS et al.

[33 U. S. (8 Pet.) 725.]

Circuit Court. E. D. Pennsylvania. 1832.[1]

#### COPYRIGHT—ACQUISITION—DEPOSITING COPY OF BOOK—CONSTRUCTION OF STATUTES—EXISTENCE OF COMMON-LAW RIGHTS.

[1. The requirement in the fourth section of the act of 1790 (1 Stat. 125) that the author shall deliver a copy of his book to the secretary of state. to be preserved in his office. is not merely directory. but, especially since the pas-

---

[1] [Reversed in 8 Pet. (33 U. S.) 591.]

sage of the supplementary act of 1802 (2 Stat. 171), is a condition which must be performed before the right of copyright can vest in the author.]

[2. The delivery to the secretary of state, by the reporter of the supreme court, of 80 copies of his Reports, in accordance with the reporter's act of 1817 (3 Stat. 376), is not to be taken as a substantial compliance with the requirement of the fourth section of the act of 1790, and cannot operate to cure an omission to deposit a copy under the latter provision.]

[3. The legislature has no right to impose upon the courts a construction of statutes previously passed. It is for the court to construe the law; but it is, nevertheless, the right and duty of the judge to look into all the statutes made upon the same subject, in order to discover what was the intention of their provisions. He is thus to ascertain their true meaning and construction by his own judgment, and not by any subsequent legislative declaration of their meaning.]

[4. In the United States there is no common-law right of copyright. The protection of authors rests exclusively upon the statutes expressly enacted by congress for that purpose.]

[This was a bill in equity by Wheaton & Donaldson against Peters and Grigg to enjoin the alleged infringement of a copyright in Wheaton's Reports of the decisions of the supreme court of the United States.]

HOPKINSON, District Judge. It is not necessary, at this time, to set forth all the details contained in the bill of complaint. It is sufficient, for the present purpose, to say that the complainants claim to have a copyright, under the statutes of the United States, or by the common law thereof, in and to the twelve books or volumes of the Reports of cases argued and adjudged in the supreme court of the United States, commonly known as Wheaton's Reports; and they charge that the defendants have violated their rights by printing or publishing a certain book or books, entitled Condensed Reports of Cases in the Supreme Court of the United States; in consideration whereof the complainants pray, among other things, that the defendants may be restrained from the further threatening to print and publish, and from the further printing, publishing and selling, or exposing to sale the said Condensed Reports; that they may be decreed to account and pay to the complainants what shall be found coming to them; and, generally, for further relief, &c. The defendant, R. Peters, denies that the book called Condensed Reports is any violation of the complainants' rights; he further denies that the Condensed Reports contain anything that is the exclusive property of the complainants, or which, being also in Wheaton's Reports, is susceptible of being made the subject of literary property. He further avers, that by an act of congress, passed on the 31st of May, 1790, it is enacted that no person shall be entitled to the benefit thereof, unless he shall deposit a printed copy of the title of his book in the clerk's office of the district where he shall reside; shall publish it in one or more news-

papers for four weeks; and shall, within six months after the publishing thereof, deliver or cause to be delivered to the secretary of state a copy of the same to be preserved in his office. He calls for proof from the complainants that these requisites of the act have been complied with. In the bill, as well as the answers, many circumstances are set forth which it is not necessary to repeat. Connecting the pleadings with the argument of the case, it may be generally stated that the complainants claim a copyright in the twelve volumes of Wheaton's Reports, under the statutes of the United States and at common law. The defendants deny that their book is a violation of the complainants' rights, if they have any, in Wheaton's Reports. They further deny that they have any such right, because they have not performed the requisites of the acts of congress of the United States on the subject of copyrights; because there is no common law copyright in the United States; and because Wheaton's Reports is not a work entitled to the benefit of copyright, either by the statutes or by the common law.

I shall first consider the complainants' right under a statute of the United States. The deficiency in their title most relied upon is that they did not, according to the requisition of the fourth section of the act of 1790, deliver or cause to be delivered to the secretary of state a copy of their book, to be preserved in his office; other omissions as to some of the volumes are also alleged. The question is, whether this injunction or direction to an author of a work seeking to obtain a copyright for it, is an essential part of his title, so that he cannot claim the benefit of the act unless he has complied with it. This is not a new question in this court. It arose in the case of Ewer v. Coxe [Case No. 4,584], decided in 1824, on the construction of the third section of the law of 1790, which stands, in this respect, on the same footing with the fourth section of the same act now under consideration. In that case the fact was admitted by the plaintiff that a copy of the record of the title of his work had not been published as the acts of congress required, but insisted that it was not necessary to vest a copyright in the proprietor of the work. In that case, therefore, the mere question of law was presented to the court on the construction of the acts of congress.

In the case now before the court, the fact, as well as the law, has been a subject of controversy between the parties; and the complainants have endeavored to show by evidence that they have complied with the terms and directions of the section of law in question. This question of fact must be first disposed of. Have the complainants made satisfactory proof that they did, within six months of the publication of their work, deliver, or cause to be delivered, a copy thereof to the secretary of state, to be preserved in his office? No official certificate, no rec-

ord of any such delivery has been produced, nor could such record be required, as we cannot say that any such record was kept, and the act of congress does not require it. The fact of delivery is open for proof by any legal and satisfactory testimony. With a view to establish it, the complainants have produced two witnesses—Mr. H. C. Carey, examined at the bar of this court, and Daniel Brent, Esq., whose deposition was taken at the city of Washington. In substance, Mr. Carey has testified that, in 1816, the first volume of Wheaton's Reports was published by his father, who then did business alone; the witness then did his father's business as his clerk; in 1821 he became a partner with him. When he did his father's business as his clerk, he, the witness, was conversant with his business as to copyrights; says they were in the constant habit of advertising, but not of keeping a copy or record of the advertisements until within the last ten years; he says the next step towards securing a copyright was to deposit a copy in the office at Washington. "We were always accustomed to do it, but never deemed it necessary to have a certificate from Washington, because we had never seen one. We supposed a record was kept at the office of the deposit of books, and could always be furnished if necessary. The earliest certificate we have is dated 1820. I don't doubt that a copy was deposited, although we have no evidence of it." On his cross-examination, he says that he has no recollection at all of a deposit of a copy of this work in the office of the secretary of state; that nine-tenths of the books they have deposited were put in the post-office, addressed to the department of state; does not pretend to recollect that this was the course in 1816. He cannot positively say that, with regard to all publications made by them, a copy was sent to the department of state. Does not know whether there was or was not a record kept in the department; has never inquired there, nor had any occasion to make the inquiry. He adds, that it was always their intention to send a copy of all works to the department of state whose titles were recorded in the clerk's office, but he won't pretend to say that it was always done.

In regard to the books in question, there is no direct proof of the delivery of any one of them to the secretary of state; there is no circumstantial proof of it—there is no proof of such an uniform custom of the trade in general, or of Mr. Carey's business in particular, from which we can infer it with that degree of certainty which constitutes proof in a court of justice. As to the books in question, Mr. Carey has no knowledge; he pretends to none. He has no more proved, or even conjectured, the delivery of Wheaton's Reports in the manner and for the purposes prescribed by the act, nor in any manner or for any purposes, than he has proved the same thing for all the many hundred works, in mass, published by him in the same period of more than

ten years. But he does show us that the most satisfactory proof was in his power, and in the power of the complainants, and could be had simply by asking for. He got a certificate of the delivery of a work for copyright as early as 1820, seven years before the conclusion of Wheaton's Reports. He farther says that until Mr. Clay came into the office, there was no order in it as to sending certificates. This was in 1825, after which we are to presume that order did exist in the office on this subject; but no certificates are shown for the volumes of Wheaton's Reports published after this period. We may advert here to the certificates produced by the defendants, some of them of a very high number, upwards of one thousand; from which we may infer that these certificates were not unknown or unusual, when the copy was actually delivered to the secretary of state. The complainants ask what evidence they are to produce of this fact. If the law makes the delivery of the volume to the secretary a requisite, a necessary part of a plaintiff's title, he must prove it by legal and satisfactory evidence, when he founds a claim on this title in a court of justice. In this case, however, nothing is required of him that is impossible, unreasonable, or difficult; nothing but what has been done by others in at least a thousand cases, and by Mr. Carey himself, in many. He has obtained and produced evidence of the same nature as to the delivery of eighty copies under another law; he might have had the same evidence of the delivery of the one copy under the copyright law. If he chose to rely on transitory and uncertain testimony, it was at his peril. He got the certificate in the one case to obtain his salary; he should have got it in the other to secure his copyright. The deposition of Mr. Brent serves the complainants no better in this part of their case. He proves the regular deposit of eighty copies under the direction of the reporter's law, but says, that there does not appear any evidence that the successive volumes of said Reports, or copies of them, were deposited in the department of state by the maker or publisher of the same, agreeably to the provisions of the laws of congress for securing copyrights to authors, &c., though the memorandum of similar deposits was kept in the patent-office, a branch of the department of state, and not at the department. The deponent believes that, for several of the first years, the memorandum and giving receipts were often neglected during the period referred to. So far as a negative may be proved, I should conclude from this testimony that no copy ever was delivered in conformity with the provisions of the act of 1790; no evidence of it appears in the department, either by record, or by finding the book there, or of any other kind, although the memorandum of similar deposits was kept in the patent-office, a branch of the department of state. I will add, on this subject, that as the law makes it the duty of the secretary of

state to preserve the copy delivered to him in his office, we are bound to presume, in the absence of contradictory evidence, that he did perform his duty, and that the mere circumstance that the book is not found there is prima facie evidence that it was never delivered there.

This view of the evidence brings us to the conclusion that the complainants have failed to prove that within six months, or indeed at any time, they did deliver to the secretary of state a copy, or copies, of the work in which they claim a copyright, according to the provisions of the fourth section of the act of 1870, and it must now be taken that they did not so deliver a copy. I will here notice an argument which has been pressed on the court with great ingenuity and force. It is that after so long an enjoyment of the right, after so long a possession undisturbed, it should be presumed that everything was done which was necessary to be done to make it perfect; and that the evidence may have been lost by the lapse and accidents of time. Any presumption of this sort is much weakened by the negative testimony of Mr. Brent: it is also weakened, if not destroyed, by another circumstance. If the deficiency existed only in the earlier volumes of the work, which were published fourteen, fifteen, and sixteen years ago, the argument might receive some favor, although the lapse of time is not very considerable; but we find the same defect in relation to the last as the first volumes of this work; the same in 1827 as in 1816, which gives rise to another presumption, that the same course was pursued as to all of them, and a copy of none delivered, according to the fourth section of the act. However the possession may have aided the complainants in their application for an interlocutory decree of injunction, until hearing, the parties now stand on their legal rights.

This view of the evidence brings us to a much more important and difficult question, that is. to the very question decided in the case of Ewer v. Coxe [Case No. 4,584], and if that decision was right, it must prevail now. The counsel on both sides have accordingly directed their most strenuous efforts, on the one side to sustain, on the other to overthrow, the authority of that decision. In that case, the plaintiff claimed a copyright in a certain book. under the acts of congress of 1790 and 1802 for securing copyrights to authors, &c. The third section of the act of 1790 enacts that no person shall be entitled to the benefit of the act unless he shall, before publication, deposit a printed copy of the title of his book in the clerk's office of the district court; the section, after giving the form of the record to be made in the office, proceeds, "and such author or proprietor shall, within two months from the date thereof, cause a copy of the said record to be published in one or

more newspapers printed in the United States, for the space of four weeks." The plaintiff admitted that he had not thus published a copy of the record of the title of his book; and the question was, whether it was a matter essential to his title—whether he could have a copyright without it. The question in the present case arises on the fourth section of the same act, but the principle of decision is the same in both cases. In deciding the case of Ewer v. Coxe [supra], the learned judge thought it material to settle whether the requisitions of the third and fourth sections of the act are merely directory, or whether their performance is essential to the vesting of a title to the copyright secured by the law; he recites the several sections of the act, and reasons upon them severally. He says, "It is perfectly clear from the language of the second section, that the proprietor can acquire no title to the copyright for the term of the first fourteen years, unless he shall deposit in the clerk's office a printed copy of the title of the book; for the section declares that he shall not be entitled to the benefit of this act unless he shall make such deposit." The judge, therefore, considers this to be a condition of the grant of the right; but he thinks that this condition cannot, "upon any grammatical construction, be extended to the requisition (he cannot avoid calling it a requisition) contained in the last sentence of the section, to publish a copy of the record, within the time and for the period prescribed." From this reasoning the judge concludes that if the title of an author to a copyright depended altogether upon this act, he should be of opinion that it would be complete, provided he had deposited a printed copy of the title of the book in the clerk's office, as directed by the second section; and that the publication of a copy of the same would only be necessary to enable him to sue for the forfeitures created by the second section. The judge then passes to the act of April, 1802. which is a supplement to the former act, and declares that every author or proprietor of a book who shall thereafter seek to obtain a copyright for the same, before he shall be entitled to the benefit of the act to which this is a supplement. he shall, in addition to the requisites enjoined in the third and fourth sections of the said act, give information by causing a copy of the record, which by the said act he is required to publish, to be inserted at full length in the title page, or in the page immediately following the title. As to this additional requisite, the judge remarks that it is obvious, the proprietor can acquire no title to the copyright unless it is complied with. He then reasons that as this new requisite is an addition to those prescribed by the third and fourth sections of the act of 1790, he must perform the whole before he can be entitled to the benefit of the act. This reasoning ap-

pears to be logical enough, and, as we shall see, the objection to it is that it is not legal —it is not technical. The judge says that the act—that is the act of 1802 (which we must observe)—will admit of no other construction; and that the meaning could not have been more clear and intelligible if the act, that is, the supplement, had declared that "the proprietor, before he should be entitled to the benefit of the act of 1790, should cause a copy of the record of the title to be published; and shall deliver a copy of the book to the secretary of state, as directed by the third and fourth sections of that act; and shall also cause a copy of the said record to be inserted in the title page," &c. The judge proceeds, "That this was the intention of the legislature, is strongly illustrated by the section of this act," &c. Of what act? what intention? Certainly the intention of the act of 1802, not of the act of 1790. The whole of the judge's reasoning is on the act of 1802, and its meaning, and not the act of 1790. If this be so, the objection made as to his opinion entirely fails in point of fact. The objection is that he was not authorized to give a construction to the first act of congress by the enactment of the second; that the legislature cannot give constructions to their own laws; that if in a second act the legislature has supposed the first had a meaning, which, in truth, it had not, this opinion of the legislature could not give such meaning to the first. To sustain this objection, a single sentence in the case of Postmaster v. Early, 12 Wheat. [25 U. S.] 148, has been relied on; the chief justice there says, "It is true that the language of the section indicates an opinion that the jurisdiction existed in the circuit courts, rather than an intention to give it; and a mistaken opinion of the legislature concerning the law does not make law." There is nothing but what is perfectly reasonable and familiar in this principle, and we can hardly suppose it was unknown to or disregarded by Judge Washington in the case of Ewer v. Coxe. When he assented to it in the supreme court he never imagined that he had overlooked or violated it on his circuit. Did he, in Ewer v. Coxe, adjudge that the publishing of the record of the title was essential to the right, under and by the act of 1790, because congress in 1802 had indicated that such was their opinion of its meaning? Did he adopt their meaning of the provisions of that act, and surrender his own? By no means: he says not a word about the meaning or construction of the first act, nor what congress had thought or indicated about it; he leaves it with the construction he had just before given to it. His opinion proceeds on his construction of the law of 1802, and of what was enacted by that law; he thinks that this law, not the law of 1790, makes the requisites of the third and fourth sections of the act of 1790 conditional and indispensa-

ble to the copyright; he finds that these requisites, by the law of 1802, are connected to and put upon the same footing with a newly created requisite, which is clearly essential to the right, and then therefore says, the whole must be performed before the author shall be entitled to the benefit of that act. But why must the whole be performed? Is it by virtue of a construction different from his own, which he puts upon the first act, in deference to the indication of the opinion of the legislature? Not at all. He says that it seems to him that the act, that is, the supplemental act, will admit of no other construction. That the meaning would not be the more clear, if the act, still the supplemental act, had declared, &c.; that is, had re-enacted the third and fourth sections of the original act, giving them the same force, effect, and character which is given to the new and additional requisite, of which it is expressly declared that it must be performed by the proprietor "before he can be entitled to the benefit of the act of 1790." In the whole argument of the judge, he confines himself strictly to the meaning and construction of the act of 1802, looking only to its own provisions and language for that meaning. He asserts that the intention of the legislature in passing the second act was to re-enact the third and fourth sections of the first, with the additional force given to the additional requisite, which he illustrates by a reference to the second section of the supplement. His reasoning on this subject is quite satisfactory to my mind, and does not interfere with the opinion of the supreme court in the case of Postmaster General v. Early [supra]. In this endeavor to show that Judge Washington has grounded his judgment in Ewer v. Coxe entirely on his construction of the law of 1802, I would not be understood to indicate an opinion that he would not have been perfectly correct if he had taken both acts together in forming his opinion of either. They are both on the same subject; the latter is a declared supplement to the former. We may consider them, to many purposes, as one act, and look to the whole in judging of the intention of any part, and in doing this we should not fall under the interdiction of the principle that "a mistaken opinion of the legislature concerning a law, does not make the law."

This being my understanding of the opinion of Judge Washington, I might rest upon it for my judgment on this part of the case, until it is overruled by a higher authority; but it is proper, at least it is not a work of supererogation, to proceed one step farther on this subject. If Judge Washington was mistaken in his construction of the act of 1802, and I am so in following him, how would the case stand on the law of 1790? May not the judge have been too strict in his grammatical construction of the provisions of that act? When a statute creates a right,

confers a benefit, a privilege on any individual, and at the same time, although not grammatically connected by being in the same sentence or clause, enjoins upon him to do certain things in relation to the right or privilege granted, can we separate them, unless they are expressly or clearly separated by the donor? May we sustain the one and suppress the other? Shall we do this by mere use of phrases? Is it enough to say that the first is a grant and the other directory, and therefore they are independent of each other? Because it is true that such cases may occur; that a statute may be so worded, that we may clearly see that something is directed to be done, which may be well separated from other enactments or provisions in the law, shall we therefore be allowed to get up a rule of construction for every case of a direction in a statute, and make a severance between a grant and everything directed to be done in relation to it, but not grammatically joined to it, merely by saying it is directory? May the favored individual take the benefit and neglect the duty? May he claim the grant as a vested right and refuse to do that which the donor, in the same instrument, enjoins upon him to do? To distinguish between an immaterial, disjoined direction in a statute, and one which is truly not so, we should look not so much to their positions in the statute, to a strict grammatical construction, for Lord Hardwicke, in 2 Atk. 95, disclaims it; but to the whole scope and design of the legislature as manifested by all the provisions of the statute. If the several parts form one whole, create a system, are members of one plan and design, they should all be taken together, to be of equal importance, to be dependent one on the other, to co-exist as one body or being. The duty imposed on the grantee is as imperative, is as much a part of the creation, as the grant to which it relates; it is a modification, a limitation, a regulation of the grant, by and according to which only it can be claimed or enjoyed. The public, the citizens of a community, acting by their representatives, confer upon an author certain privileges or rights for his exclusive benefit; and to protect him in the enjoyment of them, they impose certain penalties or give certain remedies against any person who shall violate these rights. But some protection is also due on the other side, that innocent and ignorant invaders of the privilege may not be involved in suits and penalties, by the want of accessible means of information of the subject and extent of the grant. With this wise and just object in their view the legislature, at the same time and in the same instrument by which they confer the privilege, enjoin or direct the person who would enjoy it to do certain things on his part, and among others to deliver a copy of his work to the secretary of state, to be preserved in his office, that all may know where to go to be correctly and precisely informed of what it is he claims; what is his right, and that thus they may avoid any infringement of it. This is an essential part of the scheme for the encouragement of authors, so as not to bring others innocently into trouble or, it may be, ruin. If this be so, shall we defeat or change the whole design because the different parts of it are not grammatically connected in one clause, or sentence or section; or by calling one part of it a grant and the other directory? Could it have been intended that the author should take and enjoy the benefit, and omit to do on his part what he is clearly and expressly enjoined to do, and this because it is called directory, and does not stand in this or that part of a section? Judge Washington thinks that to deposit a printed copy of the title of a book in the clerk's office is essential to the right, because it is grammatically connected with the words, "that no person shall be entitled to the benefit of this act unless," &c. In a subsequent part of the same section it is declared that the author shall cause a copy of the record to be published; and the next section enacts that he shall deliver a copy of his book to the secretary of state. The first requisite the judge thinks essential, for the reason given; and the two last not to be so, but to have reference only to the remedy, by reason of a grammatical construction of the clauses and their disconnection by position from the condition expressed in the preceding part of the section. I would rather look at the subject-matter of all the clauses and their connection with each other as component portions of one object or design. In this point of view the publication in the newspapers, and the delivery of a copy of the book to the secretary of state are, at least, as important, and more exact and diffusive in their information to the public as the deposit of a printed copy of the title in the clerk's office. In answer to the obvious reason and justice of this view of the law it is said that these provisions or requisites are but directory. How did this term get the restricted interpretation which seems to be fastened on it? How came the enactment of a statute to be thought less obligatory, because it is directory or directs something to be done? Blackstone says, "The directory part of a statute is that whereby the subject is instructed and enjoined to observe," &c. In the case of Postmaster General v. Early, the chief justice refers not merely to the several parts of the same statute, in construing a provision in it, but to the whole course of legislation on the subject, and he says he would avoid a construction which is opposite to the whole spirit of that legislation. He does not confine himself to sections or to single acts, but takes the whole of what the legislature have done on the subject to come at the meaning. The rule I would adopt in expounding the act of 1790 is the same that is taken by the court of king's bench in the case of University of Cambridge v. Bryer [16 East, 317]. Lord Ellenborough says, "I think the sound rule of construing any statute, as indeed it is of construing any

instrument, whether it be a statute, will or deed, is to look into the body of the thing to be construed, and to collect, as far as may be done, what is the intrinsic meaning of the thing." I would observe, in relation to the case of Ewer v. Coxe, that Lord Ellenborough admits that he would be obliged, by subsequent statutes, to put a perverse, and, what he should consider, an unnatural interpretation on the statute as originally passed; but he would endeavor to maintain the integrity of the original text, unvitiated by subsequent misconstructions. Le Blanc says "that construction may be materially aided and explained by the language of other statutes." He does not agree with Lord Ellenborough that he would follow a legislative misconstruction of a statute. For myself, I would deny that a legislature has a right to impose upon a court their construction of their statutes previously passed; it is for the court to construe the law; but it is, nevertheless, the right and duty of a judge to look into all the statutes made upon the same subject, to discover what was the intention and meaning of any of their provisions, thus to ascertain the true meaning and construction by his own judgment, and not by any subsequent legislative declaration of intention or construction.

In the statute of 8 Anne, c. 19, the requisition of a registry with the Stationers' Company is what is called directory, and is contained in a different section from that which confers the right; but the lord chancellor, in 2 Atk. 95, thought it was, nevertheless, essential to the right. The object of the registry, as declared by the statute, was to give such notice and information of the right as to prevent an infringement of it through ignorance; but the connection of this direction with the forfeitures is direct and explicit, which it is not in our act of 1790. I am aware that the king's bench, in Beckford v. Hood, 7 Term R. 620, held a different opinion as to the necessity of the registry. They consider it not to be essential to the right, but as only affecting the remedy, or forfeitures given by the statute. This seems to me to place the court and the parties in that suit in a singular predicament. The right claimed was under the statute, and not at common law, and, since the passing of the statute, could not be claimed according to the common law. But the party who had the right given by the statute had lost the remedy. He is therefore sent for this back to the common law. A statute, therefore, which has confessedly modified, restrained, limited the common-law right, has, nevertheless, left his common-law remedy as it was before, entirely unimpaired, unaffected by the statute. He comes, therefore, into court with the statute in one hand and the common law in the other, having a perfect right under neither; that is, his common-law right is curtailed by the statute and his statute remedy is taken away by the common-law construction of the statute. These are tech-

nical refinements which would occur only to the learned ingenuity. The author has forfeited his claim to the remedies of the statute by virtue of which he claims the right, by virtue of which he makes out that he has been wronged, because he has not obeyed the injunctions of the statute by which both the right and the remedy are given; but still he is allowed to retain the right and enforce it in another way, notwithstanding such a disobedience of the injunctions of the statute as have forfeited its remedies. I agree that all this, be it incongruous or not, may be done by the legislature if they choose, but I do not see why judges have so labored their wits to come to such a result by forced constructions, doubtful implications and tortuous reasoning. Would it not be more consonant with reason and convenience to send the party to his common-law right if he wishes a common-law remedy, and to enforce him his statute rights only by the means provided for it by the statute; and not permit him by this curious machinery to take all that is granted to him by the statute and disregard all that is required of him by the same statute. It is agreed that his common-law right, if he had any, is cut down by the statute, but yet there is no limit to its remedies; he may recover, under all and any circumstances, whatever he may persuade a jury has been his damages by the violation he complains of, thus depriving the citizens of that part of the statute which was enacted for their benefit and protection. Can we believe that such distinctions, introduced by the ingenious learning of judges, sometimes prone to be lawmakers, sometimes desirous of favoring some strong case of conscience, ever occurred to the legislature who made these statutes? Did they suppose that parts of their enactments, when they had not said so, were to be strictly carried into effect, and other parts were to be called directory, and therefore to be obeyed or not at the option of the party enjoined to perform them? When they declared that an author shall have a certain right, they also declared that he shall do certain things which are explicitly described. Did they suppose he might take the one and reject the other; that the only consequence of his disobedience would be to deprive him of the remedy provided for him by the statute, and leave him one which perhaps he likes better? Did they not believe that when he took the grant he bound himself to do all that was enjoined upon him by the same authority and the same instrument that created the grant, unless they were clearly separated and made independent of each other by the unequivocal language of that instrument? I have been tedious on this subject, but as I have ventured in this part of the case (I mean the construction of the act of 1790) to differ with the learned careful and excellent judge whose opinion in Ewer v. Coxe has been so

frequently referred to, as well as from the judgment of a majority of the judges of the supreme court of errors in the case of Nichols v. Ruggles, 3 Day, 145, I have thought myself bound to explain my reasons as I have done. As to Judge Washington, I would observe that having made up his opinion on the act of 1802, he may not have bent the force of his mind to that of 1790, or have come to a certain conclusion how he would have considered the case if it had stood on that act alone. The case of Nichols v. Ruggles was very fully argued by the counsel; but the opinion of the court appears to have been given instanter; no argument or reasonings accompany it; and in one particular, to wit, that "the copy to be delivered to the secretary of the state appears to be designed for public purposes and to have no connection with the copyright," it seems to me that the court are clearly mistaken. This will be a subject of remark hereafter.

The complainants have contended, with great earnestness and plausibility, that if there has not been a literal compliance with the requisitions of the fourth section of the act, they have been substantially performed for all the beneficial purposes intended by their enactment. In support of this position, that part of the deposition of Mr. Brent is relied on in which he has testified that eighty copies of each of the volumes of Wheaton's Reports, beginning with February term, 1817, were delivered to the department of state; he further testifies that all of the said eighty volumes were received under the act of congress giving a salary to the reporter for preparing and furnishing the said Reports. He further says that, according to his recollection, there has always been one or more complete sets of said Reports, from the time of their publication, in the said department of state. The argument assumes that the object of the act of 1790 in directing one copy of a book to be delivered to the secretary of state is the same with that of the reporter's act of 1817, in directing eighty copies of the Reports to be delivered there, one of which is for the secretary of state, and that that object was to form a library for the government, just as the statute of Anne imposes it on authors to present copies of their works to the universities; and that if this object is accomplished, it matters not whether it is done under and according to the fourth section of the law of 1790, or to the directions of the act of 1817. This construction of these laws has many difficulties to overcome. In the first place, it would be not a little singular that two acts of congress should direct the same thing to be done for the same purpose; and as both acts are unquestionably in force, the consequence would be that it is the duty of the author or proprietor of those Reports to deliver two copies of each volume for the supposed library, one under each act, and his delinquency will not be relieved by the argument. But in truth, the differences in the provisions and objects in these acts are manifest on the first inspection. The act of 1817 has nothing to do with the copyright either of books in general or of the particular works mentioned in it; nor has the provision of the fourth section of the act of 1790 any reference to a public library. The law of 1817 was passed for a special work and a special object, "to provide for the Reports of the decisions of the supreme court." It gives to the reporter an annual compensation for his services of one thousand dollars, and one of the conditions of this grant is that he shall deliver to the secretary of state eighty copies of the decisions, to be distributed in the manner, and to the public officers, designated by the act. One of these copies is to be given "to the secretary of state," and "the residue of the said copies shall be deposited in and become part of the library of congress." When a library is intended, it is thus expressly mentioned, and the library is not for the government of the department of state, but the library of congress, an establishment or institution well known to have no connection with the department, and to be kept in the capitol, at the distance of more than a mile from the office of the department of state. The reporter is bound to deliver these eighty copies, not in consideration of his copyright, as in England, where it is so much complained of, but in consideration of the salary paid to him by the United States. It is a purchase of his books. It has no connection with his copyright; he must deliver them whether he has a copyright or no. As to the object or purposes of these deliveries of a copy to the secretary under the respective acts; the one copy out of the eighty to be given to the secretary of state is for his personal use and accommodation, as the copies are that are to be distributed to the other secretaries, to the judges and other officers named in the act. He may take and use it where he finds it most convenient, and not in his office exclusively, being bound only to transmit it to his successor, who will hold it as he had done. Again, the reporter is not bound to see that the secretary, or any other of the officers named, gets the copy designed for him. He sends the whole to the department of state, and the due and proper distribution of them must be there attended to. Very different in all respects are the provisions of the copyright law. By them it is incumbent on the author or proprietor of a book to deliver one copy to the person designated to receive it, to wit, the secretary of state. The copy so delivered is to be preserved in the office; not as a gift to him, nor for his use, nor to be at his disposal beyond the limits of his office, but for an object connected with the grant of the copyright, and with nothing else. This copy must remain in the office; the secretary has no more right to remove it than any other person. It seems to me to be intended for the same purposes as the draw-

ings and models of machines in the patent-office; that our citizens may know where to go to be correctly informed what it is that is patented, and not to be led into an infringement of the right by an ignorance of what it is. I am confirmed in this view of the case by the testimony of Mr. Brent, who says that the memorandum of the deposit of books for securing copyrights was kept in the patent-office, a branch of the department of state, and it is fair to presume that the books were kept in the same place. This negatives the suggestion that these books were for the use of the secretary, or to form a library for the public. The patent-office could hardly be selected as the place for a public library. The use or purpose I have assigned to the delivery of this book is not only reasonable, but necessary for the safety of the citizens against the penalties of the act. There are numerous publications of which no information would be derived from the titles deposited in the clerk's office and published in the newspapers, such as extracts from poets or eminent prose writers, collections or abridgements of voyages, selected letters, &c., &c. The materials are common property, and exist in great masses; and it is only by an examination of the work that any one can know in what manner, or to what extent, the copyright author has appropriated them to himself. The intention of this provision, is, at least, much more likely to be that which I have suggested, than that it should have been for the use of the secretary or his department. The injunction is laid on the proprietors of all books for which a copyright is claimed, not only for the Reports of the decisions of the supreme court, which we may believe would be a desirable acquisition for that officer. But how can we make this supposition of many other books which have been or may be deposited for copyright? Was it intended to give so dignified a destiny to a spelling book, a Greek grammar, an edition of Hoyle's games, an apothecary's manual—as in the case of Ewer v. Coxe, a cooking-book, a song-book, a jest-book? We cannot, without something more than a smile, imagine that congress directed such works to be delivered to the secretary of state, for his special use, or for the formation of a public library. The delivery of the copy under our copyright law, as I have said, is analogous to that required by the statute of Anne, to be sent to the Stationers' Company, and not to the copies to be given to the libraries of the universities. It is true that nine copies of every work are to be sent, for the universities, to the Stationers' Company, as well as that which is to be preserved there, but none are sent to the universities but such as they shall demand; and they will not, therefore, have their shelves loaded with such stuff as I have alluded to, which will, perforce, be crowded into our public library, and must be preserved there, on the construction given to this provision by the complainant. Nor is it enough to say that if a copy be, in fact,

in the office of the secretary of state, it is a compliance with the law for all the purposes of the law: it must be delivered in pursuance of the act, to be preserved there as the act directs, or the court cannot know that it is there, how long it has been there, or how long it will remain there. It may have been there at the period the witness speaks of—it may not be there the next day, for there is no obligation to keep it there, unless it were brought there by and in conformity with the act of congress, which makes it the duty of the secretary to preserve it in the office. I know that courts of equity have gone very far, and very frequently, in substituting what they have deemed to be the substantial compliance with the requisitions of the statute, for the actual requisitions. This has been especially done in relation to the recording acts and the statute of frauds. As to the first, they have felt authorized to accept proof of notice in fact of an actual personal knowledge for the recorded notice called for by the law. I think I shall be supported by the profession in saying that it is regretted that these departures from the enactments of the statutes were ever indulged. It has thrown into uncertainty that which the law had made certain; it has left to float in transitory and fallible evidence what the law had provided for by permanent immutable testimony. Nor can I perceive how it is that the legislature had not the same absolute authority to prescribe the kind of notice that shall be received by the courts of any fact, as that any notice should be given of it; nor how judges can dispense with the one more than with the other. What has been decided and done in such cases must remain; but I will never add another step to it.

If the complainants have failed to sustain their case by and under the acts of congress, the question occurs, are they supported in it by the common law? The question of the existence of a common law in the United States was particularly noticed, I believe, for the first time judicially, in the case of U. S. v. Worrall [Case No. 16,766]. In that case Judge Chase, the most learned constitutional as well as common-law lawyer, said, "In my opinion, the United States, as a federal government, have no common law; if, indeed, the United States can be supposed for a moment to have a common law, it must, I presume, be that of England; and yet it is impossible to trace when or how the system was adopted or introduced. With respect to the individual states, the difficulty does not occur. When the American colonies were first settled by our ancestors, it was held, as well by the settlers as the judges and lawyers of England, that they brought hither as a birthright and inheritance so much of the common law as was applicable to their local situation and change of circumstances. But each colony judged for itself what parts of the common law were applicable to its new conditions, and in various modes, by legislative acts, by judicial decisions, or by constant

usage, adopted some and rejected others. The whole of the common law has nowhere been introduced; some states have rejected what others have adopted; and there is, in short, a great and essential diversity in the subjects to which the common law is applied, as well as in the extent of its application." He adds, as the result of these positions, "that the common law will always apply to suits between citizen and citizen, whether they are instituted in a federal or a state court." As regards the common law of the United States, as such, he says, "The United States did not bring it with them from England; the constitution does not create it, and no act of congress has assumed it. Besides, what is the common law to which we are referred? Is it the common law entire, as it exists in England; or modified, as it exists in some of the states; and of the various modifications, what are we to select—the system of Georgia or New Hampshire, of Pennsylvania or Connecticut?"

In general, it seems to me that these principles and arguments cannot be controverted; they have never been judicially repudiated. When in a suit in the courts of the United States the common law has been received as the rule of decision, it has been received not as a law of the United States, prevailing with authority, through all equally and alike, but as the law of some particular state, by which the particular case was governed. The court does not adopt it as the common law of England, or of the United States, but as the law of the state which has adopted it and made it its own. The question, however, discussed by Judge Chase is much broader than that we have to entertain; it has not been contended, it could not be, that the whole common law of England, as it exists there, has ever been received in the United States, or in any one of them. Parts of it only have been adopted, and the evidence of such adoption is to be sought in "legislative acts, in judicial decisions, or constant usage." Has any such evidence—has any evidence of any description—been produced to show that what is asserted to be the common-law copyright in England, has ever been adopted by any one of the United States? Was it brought hither by our ancestors? Was it applicable to their local situation and change of circumstances? Or has it ever been so considered? A question meets us here at once—was it at the period of the migration of our ancestors a known, recognized and settled right even in England? What is its history—its judicial history? It is wrapped in obscurity and uncertainty. The general question was first discussed in 1760, long after the settlement of these colonies, in the case of Tonson v. Collins [1 W. Bl. 301], and no decision was given. In 1769 the celebrated case of Millar v. Taylor [4 Burrows. 2303] was argued, in which the subject was examined at great length. The great question was, whether the right of an author in his works, after publication, was a common-

law right which always existed, and did still exist, independent of, and not taken away by, the statute of Anne? Three of the judges were in favor of the plaintiff's copyright; but their judgment was shaken violently, if not to the foundation, by the opposing argument of Judge Yeates. Some years after this decision, that is, in 1774, the question came before the house of lords in the case of Donaldson v. Beckett [2 Brown, P. C. 129]. Of eleven judges, eight to three were in favor of the common-law right, seven to four held that printing and publishing did not deprive the author of the right. Five thought that the action at common law was not taken away by the statute, and six were of an opposite opinion. Judge Kent, speaking of the judgment in Millar v. Taylor, says, "The court was not unanimous; and the subsequent decision of the house of lords in Donaldson v. Beckett, in February, 1774, settled this litigated question against the opinion of the king's bench, by establishing that the common-law right of action (if any existed) could not be exercised beyond the time limited by the statute."

Can we believe that this common-law copyright was a known, understood and settled thing in these colonies, brought here by our ancestors as their birthright, when down at least to 1774 the greatest lawyers in England were disputing about its existence there; and when even those who held that it did exist, could not agree as to what it was; nor how far it was or was not modified by the statutory provisions? Did our forefathers ascertain, adopt and regulate a right, which Mansfield, Yeates and Camden could not agree about or understand alike? Judge Kent adds his doubt on the question, when he says, "if any existed." As to its reception and adoption as part of the law of the United States, we cannot but observe that this learned and searching jurist, although treating very fully on the subject of copyright, gives no suggestion of the existence of a common-law right in the United States, or in any of them, nor of any other right than that which is granted by the acts of congress, to be enjoyed on complying with the terms prescribed by them. He particularly notices the agitation of the question in England, and, as we have seen, does not seem to consider it certainly settled there. Here he was directly upon the subject; and although he thinks the laws of congress afford an adequate protection, he does not intimate that an author has any beyond them. The efforts of those judges in England who have labored to preserve to an author the common-law right, together with that given to him by the statute, seem to me not to have sufficiently considered the uncertainty and inconvenience which would grow out of such a system. If these two rights are co-existent, the question occurs, who would take for a limited period, under the statute, what he may enjoy in perpetuity by the common law, or what is there to prevent an author from using the privileges and remedies of the statute, for the term

prescribed, and then going back to his common-law right? The injustice and incongruity of such a proceeding was admitted; and how is it avoided? These judges have said, and such was the final disposition of the question, if it be finally determined, that they would confine this common law within the limits of time prescribed by the statute. And where do they find their authority for this arrangement? The statute gives no warrant for it; the common law gives none. The limits imposed by the statute have relation expressly and only to the rights derived from it, and not to any right which was vested in an author, independent of the statute. If they may fetter the common-law right with this enactment, why did they not impose upon it all the other conditions of the law; and, in short, bring the whole right under and within the statutory provisions, and take the statute as a modification or substitute of any pre-existent rights, as a legislative declaration of what should be the whole law on the subject for the future? The judges themselves made themselves legislators when they thus regulated the enjoyment of a right by their own authority. We shall keep ourselves free from such embarrassments, and from the necessity of resorting to such expedients to escape from them, by resting the protection of authors upon the statutes expressly enacted for that purpose, and in believing that our legislature has done that which is just to them, and without inconvenience and danger to the public. This is the only right, the only protection that I can recognize; and I do not find that any other has ever been recognized here. No judicial decision or dictum of any court of the United States, nor of any court of a state, before or since the adoption of our present constitution, before or since the Revolution, has been produced on this argument, which recognizes the common-law right now claimed. On the contrary, before the whole power of legislating on this subject was surrendered to the federal government, many of the states did pass laws for the protection of authors; and if, as is unquestionable, the acts of congress have superseded all the state statutes on the subject, why have they not also superseded the state common law, if it ever existed? It certainly never had a more sacred and intangible character than the statute law; and the same policy which abrogated the latter, and transferred the whole subject to federal legislation, has swept away every other law inconsistent with that policy and legislation. It was intended to put the whole subject under the regulation of congress, and of congress only. But I have found, the counsel have found, no common law such as is now set up in the colonies, in the states, or in the United States, and if I am now to recognize it, I must first make it. As I have mentioned the state statutes on this subject, I should notice an argument much pressed from the use in them of the word "securing" and not "vesting" the right. This is too slender a foundation to raise an acknowledged pre-existing right upon. The same term is used in the act of congress of 1790, but was it an acknowledgment by congress that the United States, as such, had a common law which vested the right, and that they passed their law only to secure it?

Holding the opinion that the complainants have not entitled themselves to the aid and benefit of the statutes of the United States for the protection of authors, and that they have no right at common law which this court can recognize and protect, it is not necessary for me to give any opinion on the remaining question argued at the bar, whether the Reports in question may or may not be the subject of literary property. Let the complainants go to the law side of the court, and if they shall establish their right there, they may return and claim the aid of this court to protect that right. As it now stands, or were it even more doubtful, equity cannot interpose her extraordinary powers between the parties.

I am conscious of the importance of the questions which have been discussed in this cause, to the parties and to the public; and it is a real satisfaction to me to know that my opinion may be, and I presume will be, reviewed by another tribunal. Injunction dissolved, and the bill dismissed.

[On appeal to the supreme court the decree of this court was reversed. 8 Pet. (33 U. S.) 591.]