HENRY WHEATON AND ROBERT DONALDSON, APPELLANTS V.
RICHARD PETERS AND JOHN GRIGG.

594

The case was argued by Mr Paine and Mr Webster, for the appellants; and by Mr Ingersoll, by a printed argument, and Mr Sergeant, for the defendants.

Mr Paine, for the appellants, contended :

598

600

602

604

608

610

612

614

616

618

Mr J. R. Ingersoll, for the defendants.

620

622

624

626

628

630

632

634

636

Mr Sergeant, for the defendants.

640

642

644

646

648

650

Mr Webster, in reply.

652

Mr Justice M'LEAN delivered the opinion of the Court.

After stating the case, he proceeded :

Some of the questions which arise in this case are as novel, in this country, as they are interesting. But one case involving similar principles, except a decision by a state court, has occurred ; and that was decided by the circuit court of the United States for the district of Pennsylvania, from whose decree no appeal was taken.

The right of the complainants must be first examined. If this right shall be sustained as set forth in the bill, and the defendants shall be proved to have violated it, the court will be bound to give the appropriate redress.

The complainants assert their right on two grounds.

First, under the common law.

Secondly, under the acts of congress.

And they insist, in the first place, that an author was entitled, at common law, to a perpetual property in the copy of his works, and in the profits of their publication ; and to recover damages for its injury, by an action on the case, and to the protection of a court of equity.

In support of this proposition, the counsel for the complainants have indulged in a wide range of argument, and have shown great industry and ability. The limited time allowed for the preparation of this opinion, will not admit of an equally extended consideration of the subject by the court.

Perhaps no topic in England has excited more discussion, among literary and talented men, than that of the literary property of authors. So engrossing was the subject, for a long time, as to leave few neutrals, among those who were distin-

guished for their learning and ability.. At length the question, whether the copy of a book or literary composition belongs to the author at common law, was ·brought before the court of king's bench, in the great case of· Miller v. Taylor, reported in 4 Burr. 2303. This was a case of great expectation ; and the four judges, in giving their opinions, seriatim, exhausted the argument on both sides. Two of the judges, and Lord Mansfield held, that, by the common law, an author had a literary property in his works ; and they sustained their opinion with very great ability. Mr Justice Yeates, in an opinion of great length, and with an ability, if equalled, certainly not surpassed, maintained the opposite ground.

Previous to this case, injunctions had issued out of chancery to prevent the publication of certain works, at the instance of those who claimed a property in the copyright, but no decision had been given. And a case had been commenced, at law,, between Tonson and Collins, on the same ground, and was argued with great ability, more· than once, and the court of king's bench were about to take the opinion of all the judges, when they discovered that the suit had been brought by collusion, to try the question, and it was dismissed.

This question was brought before the house of lords, in the case of Donaldson v. Beckett and others, reported in 4 Burr. 2408.

Lord Mansfield, being a peer, through feelings of delicacy, declined giving any opinion. The eleven judges gave their opinions on the following points. 1st. Whether at common law an author of any book or literary ·composition, had the sole right of first printing, and publishing the same for sale ; and might bring an action against any person who printed, published and sold the same, without his consent. On this question there were eight judges in the affirmative, and three in. the negative.

2d. If the author had such right originally, did the law take it away, upon his printing and publishing such book or literary composition; and might any person, afterward, reprint and sell, for his own benefit, such book or literary composition, against ·the will of the author. This question was answered in the affirmative, by four judges, and in the negative by seven.

3d. If such action would have lain, at common law, is it taken away by the statute of 8 Anne ; and is an author, by

the said statute, precluded from every remedy, except on the foundation of the said statute, and on the terms of the conditions prescribed thereby. Six of the judges, to five, decided that the remedy must be under the statute.

4th. Whether the author of any literary composition, and his assigns, had the sole right of printing and publishing the same in perpetuity, by the common law. Which question was decided in favour of the author, by seven judges to four.

5th. Whether this right is any way impeached, restrained or taken away, by the statute 8 Anne? Six, to five judges, decided that the right is taken away by the statute. And the lord chancellor, seconding Lord Camden's motion to reverse, the decree was reversed.

It would appear from the points decided, that a majority of the judges were in favour of the common law right of authors, but that the same had been taken away by the statute.

The title and preamble of the statute, 8 Anne, ch. 19, is as follows : " An act for the encouragement of learning by vesting the copies of printed books in the authors or purchasers of such copies, during the times therein mentioned.

" Whereas printers, booksellers and other persons, have of late frequently taken the liberty of printing, reprinting and publishing, or causing to be printed, reprinted and published, books and other writings without the consent of the authors or proprietors of such books and writings, to their very great detriment, and too often to the ruin of them and their families," &c.

In 7 Term Rep. 627, Lord Kenyon says, " all arguments in the support of the rights of learned men in their works, must ever be heard with great favour by men of liberal minds to whom they are addressed. It was probably on that account that when the great question of literary property was discussed, some judges of enlightened understanding went the length of maintaining, that the right of publication rested exclusively in the authors and those who claimed under them for all time; but the other opinion finally prevailed, which established that the right was confined to the times limited by the act of parliament. And, that, I have no doubt, was the right decision."

And in the case of the University of Cambridge v. Pryer, 16 East 319, Lord Ellenborough remarked, " it has been said that

the statute of 8 Anne has three objects : but I cannot subdivide the two first ; I think it has only two.. The counsel for the plaintiffs contended that there was no right at common law ; and perhaps there might not be ; but of that we have not particularly any thing to do."

From the above authorities, and others which might be referred to if time permitted, the law appears to be well settled in England, that, since the statute of 8 Anne, the literary property of an author in his works can only be asserted under the statute. And that, notwithstanding the opinion of a majority of the judges in the great case of Miller v. Taylor was in favour of the common law right before the statute, it is still considered, in England, as a question by no means free from doubt.

That an author, at common law, has a property in his manuscript, and may obtain redress against any one who deprives him of it, or by improperly obtaining a copy endeavours to realise a profit by its publication, cannot be doubted ; but this is a very different right from that which asserts a perpetual and exclusive property in the future publication of the work, after the author shall have published it to the world.

The argument that a literary man is as much entitled to the product of his labour as any other member of society, cannot be controverted. And the answer is, that he realises this product by the transfer of his manuscripts, or in the sale of his works, when first published.

A book is valuable on account of the matter it contains, the ideas it communicates, the instruction or entertainment it affords. Does the author hold a perpetual property in these ?. Is there an implied contract by every purchaser of his book, that he may realise whatever instruction or entertainment which the reading of it shall give, but shall not write out or print its contents.

In what respect does the right of an author differ from that of an individual who has invented a most useful and valuable machine ? In the production of this, his mind has been as intensely engaged, as long; and, perhaps, as usefully to the public, as any distinguished author in the composition of his book.

The result of their labours may be equally beneficial to

society, and in their respective spheres they may be alike distinguished for mental vigour. Does the common law give a perpetual right to the author, and withhold it from the inventor? And yet it has never been pretended that the latter could hold, by the common law, any property in his invention, after he shall have sold it publicly.

It would seem, therefore, that the existence of a principle may well be doubted, which operates so unequally. This is not a characteristic of the common law. It is said to be founded on principles of justice, and that all its rules must conform to sound reason.

Does not the man who imitates the machine profit as much by the labour of another, as he who imitates or republishes a book? Can there be a difference between the types and press with which one is formed; and the instruments used in the construction of the others?

That every man is entitled to the fruits of his own labour must be admitted; but he can enjoy them only, except by statutory provision, under the rules of property, which regulate society, and which define the rights of things in general.

But, if the common law right of authors were shown to exist in England, does the same right exist, and to the same extent, in this country.

It is clear, there can be no common law of the United States. The federal government is composed of twenty-four sovereign and independent states; each of which may have its local usages, customs and common law. There is no principle which pervades the union and has the authority of law, that is not embodied in the constitution or laws of the union. The common law could be made a part of our federal system, only by legislative adoption.

When, therefore, a common law right is asserted, we must look to the state in which the controversy originated. And in the case under consideration, as the copyright was entered in the clerk's office of the district court of Pennsylvania, for the first volume of the book in controversy, and it was published in that state; we may inquire, whether the common law, as to copyrights, if any existed, was adopted in Pennsylvania.

It is insisted, that our ancestors, when they migrated to this

country, brought with them the English common law, as a part of their heritage.

That this was the case, to a limited extent, is admitted. No one will contend, that the common law, as it existed in England, has ever been in force in all its provisions, in any state in this union. It was adopted, so far only as its principles were suited to the condition of the colonies : and from this circumstance we see, what is common law in one state, is not so considered in another. The judicial decisions, the usages and customs of the respective states, must determine, how far the common law has been introduced and sanctioned in each.

In the argument, it was insisted, that no presumption could be drawn against the existence of the common law, as to copyrights, in Pennsylvania, from the fact of its never having been asserted, until the commencement of this suit.

It may be true, in general, that the failure to assert any particular right, may afford no evidence of the non existence of such right. But the present case may well form an exception to this rule.

If the common law, in all its provisions, has not been introduced into Pennsylvania, to what extent has it been adopted? Must not this court have some evidence on this subject. If no right, such as is set up by the complainants, has heretofore been asserted, no custom or usage established, no judicial decision been given, can the conclusion be justified, that, by the common law of Pennsylvania, an author has a perpetual property in the copyright of his works.

These considerations might well lead the court to doubt the existence of this law in Pennsylvania ; but there are others of a more conclusive character.

The question respecting the literary property of authors, was not made a subject of judicial investigation in England until 1760 ; and no decision was given until the case of Miller v. Taylor was decided in 1769. Long before this time, the colony of Pennsylvania was settled. What part of the common law did Penn and his associates bring with them from Engand ?

The literary property of authors, as now asserted, was then unknown in that country. Laws had been passed, regulating the publication of new works under license. And the king, as the head of the church and the state, claimed the exclusive

660

right of publishing the acts of parliament, the book of common prayer, and a few other books.

No such right at the common law had been recognized in England, when the colony of Penn was organized. Long afterwards, literary property became a subject of controversy, but the question was involved in great doubt and perplexity; and a little more than a century ago, it was decided by the highest judicial court in England, that the right of authors could not be asserted at common law, but under the statute. The statute of 8 Anne was passed in 1710.

Can it be contended, that this common law right, so involved in doubt as to divide the most learned jurists of England, at a period in her history, as much distinguished by learning and talents as any other: was brought into the wilds of Pennsylvania by its first adventurers. Was it suited to their condition?

But there is another view still more conclusive.

In the eighth section of the first article of the constitution of the United States it is declared, that congress shall have power "to promote the progress of science and useful arts, by securing for limited times, to authors and inventors, the exclusive right to their respective writings and discoveries." And in pursuance of the power thus delegated, congress passed the act of the 30th of May 1790.

This is entitled "an act for the encouragement of learning, by securing the copies of maps, charts and books, to the authors and proprietors of such copies, during the times therein mentioned."

In the first section of this act, it is provided, "that from and after its passage, the author and authors of any map, chart, book or books, already printed within these United States, being a citizen, &c. who hath or have not transferred to any other person the copyright of such map, chart, book or books, &c. shall have the sole right and liberty of printing, reprinting, publishing and vending such map, book or books, for fourteen years."

In behalf of the common law right, an argument has been drawn from the word *secure*, which is used in relation to this right, both in the constitution and in the acts of congress. This word, when used as a verb active, signifies to protect, insure, save, ascertain, &c.

The counsel for the complainants insist that the term, as used, clearly indicates an intention, not to originate a right, but to protect one already in existence.

There is no mode by which the meaning affixed to any word or sentence, by a deliberative body, can be so well ascertained, as by comparing it with the words and sentences with which it stands connected. By this rule the word *secure*, as used in the constitution, could not mean the protection of an acknowledged legal right. It refers to inventors, as well as authors, and it has never been pretended, by any one, either in this country or in England, that an inventor has a perpetual right, at common law, to sell the thing invented.

And if the word *secure* is used in the constitution, in reference to a future right, was it not so used in the act of congress?

But, it is said, that part of the first section of the act of congress, which has been quoted, a copyright is not only recognized as existing, but that it may be assigned, as the rights of the assignee are protected, the same as those of the author.

As before stated, an author has, by the common law, a property in his manuscript; and there can be no doubt that the rights of an assignee of such manuscript, would be protected by a court of chancery. This is presumed to be the copyright recognized in the act, and which was intended to be protected by its provisions. And this protection was given, as well to books published under such circumstances, as to manuscript copies.

That congress, in passing the act of 1790, did not legislate in reference to existing rights, appears clear, from the provision that the author, &c. "shall have the sole right and liberty of printing," &c. Now if this exclusive right existed at common law, and congress were about to adopt legislative provisions for its protection, would they have used this language? Could they have deemed it necessary to vest a right already vested. Such a presumption is refuted by the words above quoted, and their force is not lessened by any other part of the act.

Congress, then, by this act, instead of sanctioning an existing right, as contended for, created it. This seems to be the clear import of the law, connected with the circumstances under which it was enacted.

From these considerations i would seem, that if the right of the complainants can be sustained, it must be sustained under the acts of congress. Such was, probably, the opinion of the counsel who framed the bill, as the right is asserted under the statutes, and no particular reference is made to it as existing at common law. The claim, then, of the complainants, must be examined in reference to the statutes under which it is asserted.

There are but two statutes which have a bearing on this subject; one of them has already been named, and the other was passed the 29th of April 1802.

The first section of the act of 1790 provides, that an author, or his assignee, " shall have the sole right and liberty of printing, reprinting, publishing and vending such map, chart, book or books, for the term of fourteen years, from the recording of the title thereof in the clerk's office, as hereinafter directed : and that the author, &c. in books not published, &c. shall have the sole right and liberty of printing, reprinting, publishing and vending such map, chart, book or books, for the like term of fourteen years, from the time of recording the title thereof in the clerk's office, as aforesaid. And at the expiration of the said term, the author, &c. shall have the same exclusive right continued to him, &c. for the further term of fourteen years : provided he or they shall cause the title thereof to be a second time recorded, and published in the same manner as is hereinafter directed, and that within six months before the expiration of the first term of fourteen years."

The third section provides, that " no person shall be entitled to the benefit of this act, &c., unless he shall first deposit, &c., a printed copy of the title in the clerk's office, &c." " And such author or proprietor, shall within two months from the date thereof, cause a copy of said record to be published in one or more of the newspapers printed in the United States, for the space of four weeks."

And the fourth section enacts that " the author, &c., shall, within six months after the publishing thereof, deliver or cause to be delivered to the secretary of state, a copy of the same, to be preserved in his office."

The first section of the act of 1802 provides, that "every person who shall claim to be the author, &c., before he shall

be entitled to the benefit of the act entitled an act for the encouragement of learning, by securing the copies of maps, charts and books, to the authors and proprietors of such copies, during the time therein mentioned, he shall, in addition to the requisites enjoined in the third and fourth sections of said act, if a book or books, give information by causing the copy of the record which by said act he is required to publish, to be inserted in the page of the book next to the title."

These are substantially the provisions by which the complainants' right must be tested. They claim under a renewal of the term, but this necessarily involves the validity of the right under the first as well as the second term. In the language of the statute, the " same exclusive right" is continued the second term that existed the first.

It will be observed, that a right accrues under the act of 1790, from the time a copy of the title of the book is deposited in the clerk's office. But the act of 1802 adds another requisite to the accruing of the right, and that is, that the record made by the clerk, shall be published in the page next to the title page of the book.

And it is argued with great earnestness and ability, that these are the only requisites to the perfection of the complainants' title. That the requisition of the third section to give public notice in the newspapers, and that contained in the fourth to deposit a copy in the department of state; are acts subsequent to the accruing of the right, and whether they are performed or not, cannot materially affect the title.

The case is compared to a grant with conditions subsequent, which can never operate as a forfeiture of the title. It is said also that the object of the publication in the newspapers, and the deposite of the copy in the department of state was merely to give notice to the public; and that such acts, not being essential to the title, after so great a lapse of time, may well be presumed. That if neither act had been done, the right of the party having accrued, before either was required to be done, it must remain unshaken.

This right, as has been shown, does not exist at common law—it originated, if at all, under the acts of congress. No one can deny that when the legislature are about to vest an exclusive right in an author or an inventor, they have the

power to prescribe the conditions on which such right shall be enjoyed; and that no one can avail himself of such right who does not substantially comply with the requisitions of the law.

This principle is familiar, as it regards patent rights; and it is the same in relation to the copyright of a book. If any difference shall be made, as it respects a strict conformity to the law, it would seem to be more reasonable to make the requirement of the author, rather than the inventor.

The papers of the latter are examined in the department of state, and require the sanction of the attorney-general; but the author takes every step on his own responsibility, unchecked by the scrutiny or sanction of any public functionary.

The acts required to be done by an author, to secure his right, are in the order in which they must naturally transpire. First, the title of the book is to be deposited with the clerk, and the record he makes must be inserted in the first or second page; then the public notice in the newspapers is to be given; and within six months after the' publication of the book, a copy must be deposited in the department of state.

A right undoubtedly accrues on the record being made with the clerk, and the printing of it as required; but what is the nature of that right. Is it perfect? If so, the other two requisites are wholly useless.

How can the author be compelled either to give notice in the newspaper, or deposit a copy in the state department. The statute affixes no penalty for a failure to perform either of these acts; and it provides no means, by which it may be enforced.

But we are told they are unimportant acts. If they are indeed wholly unimportant, congress acted unwisely in requiring them to be done. But whether they are important or not, is not for the court to determine, but the legislature; and in what light they were considered by the legislature, we can learn only by their official acts.

Judging then of these acts by this rule, we are not at liberty to say they are unimportant and may be dispensed with. They are acts which the law requires to be done, and may this court dispense with their performance?

But the inquiry is made, shall the non performance of these subsequent conditions operate as a forfeiture of the right?

The answer is, that this is not a technical grant of precedent and subsequent conditions. All the conditions are important; the law requires them to be performed; and, consequently, their performance is essential to a perfect title. On the performance of a part of them, the right vests; and this was essential to its protection under the statute : but other acts are to be done, unless congress have legislated in vain, to render the right perfect.

The notice could not be published until after the entry with the clerk, nor could the book be deposited with the secretary of state until it was published. But these are acts not less important than those which are required to be done previously. They form a part of the title, and until they are performed, the title is not perfect.

The deposite of the book in the department of state, may be important to identify it at any future period, should the copyright be contested, or an unfounded claim of authorship asserted.

But, if doubts could be entertained whether the notice and deposite of the book in the state department, were essential to the title, under the act of 1790; on which act my opinion is principally founded; though I consider it in connexion with the other act; there is, in the opinion of three of the judges, no ground for doubt under the act of 1802. The latter act declares that every author, &c. before he shall be entitled to the benefit of the former act, shall, "in addition to the requisitions enjoined in the third and fourth sections of said act, if a book, publish," &c.

Is not this a clear exposition of the first act ? Can an author claim the benefit of the act of 1790, without performing "the requisites enjoined in the third and fourth sections of it." If there be any meaning in language, the act of 1802, the three judges think, requires these requisites to be performed "in addition" to the one required by that act, before an author, &c. "shall be entitled to the benefit of the first act."

The rule by which conditions precedent and subsequent are construed, in a grant, can have no application to the case under consideration ; as every requisite, in both acts, is essential to the title.

A renewal of the term of fourteen years, can only be ob-

tained by having the title page recorded with the clerk, and the record published on the page next to that of the title, and public notice given within six months before the expiration of the first term.

In opposition to the construction of the above statutes, as now given, the counsel for the complainants referred to several decisions in England, on the construction of the statute of 8 Anne, and other statutes.

In the case of Beckford v. Hood, 7 Term Rep. 620, the court of king's bench decided, "that an author, whose work is pirated before the expiration of twenty-eight years from the first publication of it, may maintain an action on the case for damages, against the offending party, although the work was not entered at Stationers Hall." But this entry was necessary only to subject the offender to certain penalties, provided in the statute of 8 Anne. The suit brought was not for the penalties, and consequently, the entry of the work at Stationers Hall, was not made a question in the case. In the case of Blackwell v. Harper, 2 Atk. 95, Lord Hardwicke is reported to have said, upon the act of 8 Anne, c. 19, "the clause of registering with the Stationers Company, is relative to the penalty, and the property cannot vest without such entry;" for the words are, "that nothing in this act shall be construed to subject any bookseller, &c. to the forfeitures, &c. by reason of printing any book, &c. unless the title to the copy of such book, hereafter published, shall, before such publication, be entered in the register book of the Company of Stationers."

The very language quoted by his lordship shows, that the entry was not necessary to an investiture of the title, but to the recovery of the penalties provided in the act against those who pirated the work.

His lordship decided in the same case, that "under an act of parliament, providing that a certain inventor shall have the sole right and liberty of printing and reprinting certain prints for the term of fourteen years, and to commence from the day of first publishing thereof, which shall be truly engraved with the name of the proprietor on each plate, and printed on every such print or prints," the property in the prints vests absolutely in the engraver, though the day of publication is not mentioned."

The authority of this case is seriously questioned in the case of Newton v. Cowie, 4 Bingham 241.. And it would seem, from the decision of Lord Hardwicke, that he had doubts of the correctness of the decision, as he decreed an injunction, without by-gone profits. And Lord Alvanly, in the case of Harrison v. Hogg, cited in 4 Bing. 242, said " that he was glad he was relieved from deciding on the same act, as he was inclined to differ from Lord Hardwicke."

By a reference to the English authorities in the construction of statutes, somewhat analogous to those under which the complainants set up their right, it will be found that the decisions often conflict with each other; but it is believed that no settled construction has been given to any British statute, in all respects similar to those under consideration, which is at variance with the one now given. If, however, such an instance could be found, it would not lessen the confidence we feel in the correctness of the view which we have taken.

The act of congress under which Mr Wheaton, one of the complainants, in his capacity of reporter, was required to deliver eighty copies of each volume of his reports to the department of state, and which were, probably, faithfully delivered, does not exonerate him from the deposite of a copy under the act of 1790. The eighty volumes were delivered for a different purpose; and cannot excuse the deposite of the one volume as specially required.

The construction of the acts of congress being settled, in the further investigation of the case it would become necessary to look into the evidence and ascertain whether the complainants have not shown a substantial compliance with every legal requisite. But on reading the evidence we entertain doubts, which induce us to remand the cause to the circuit court, where the facts can be ascertained by a jury.

And the cause is accordingly remanded to the circuit court, with directions to that court to order an issue of facts to be examined and tried by a jury, at the bar of said court, upon this point, viz. whether the said Wheaton as author, or any other person as proprietor, had complied with the requisites prescribed by the third and fourth sections of the said act of congress, passed the 31st day of May 1790, in regard to the volumes of Wheaton's Reports in the said bill mentioned, or in

regard to one or more of them in the following particulars, viz. whether the said Wheaton or proprietor did, within two months from the date of the recording thereof in the clerk's office of the district court, cause a copy of the said record to be published in one or more of the newspapers printed in the resident states, for the space of four weeks; and whether the said Wheaton or proprietor after the publishing thereof, did deliver or cause to be delivered to the secretary of state of the United States, a copy of the same to be preserved in his office, according to the provisions of the said third and fourth sections of the said act.

And if the said requisites have not been complied with in regard to all the said volumes, then the jury to find in particular in regard to what volumes they or either of them have been so complied with.

It may be proper to remark that the court are unanimously of opinion, that no reporter has or can have any copyright in the written opinions delivered by this court; and that the judges thereof cannot confer on any reporter any such right.

Mr Justice THOMPSON, dissenting.

It is matter of regret with me, at any time to dissent from an opinion pronounced by a majority of this court, and where my mind is left balancing, after a full examination of the case, my habitual respect for the opinion of my brethren may justify a surrender of my own. But where no such apology is left to me to rest upon, it becomes a duty to adhere to my own opinion; and I shall proceed to assign the reasons which have led me to a conclusion different from that at which a majority of the court has arrived.

It is unnecessary for me to state any thing more with respect to the bill and answer, than barely to observe that the complainants in the court below rest their claim, both upon the statutory and the common law right. The bill charges, that all the provisions of the acts of congress have been complied with; that every thing has been done which was required by those acts in order to entitle them to the benefit thereof; and that if it were otherwise, the orator, Henry Wheaton, has, as the author of said reports, the property in the copy of the same, and the sole right to enjoy and dispose of the same.

It would be improper in the present stage of this cause to examine the evidence which was before the court below, touching certain questions of fact which it is alleged are required by the acts of congress in order to entitle the complainants to the benefit of those acts, have been complied with. An issue has been directed to inquire into those matters. Nor is it deemed necessary to examine whether the publication of the Condensed Reports by the defendants, is a violation of the complainants' copyright, if they have complied with all the requisites of the acts of congress. This would seem necessarily implied, by the ordering of the issue; for such inquiries would be useless, if the right secured under those acts has not been violated.

I shall therefore confine myself to an examination of the common law right, and the effect and operation of the acts of congress upon such right.

I think I may assume as a proposition not to be questioned, that in England, prior to the statute of Anne, the right of an author to the benefit and profit of his work, is recognized by the common law. No case has been cited on the argument, and none has fallen under my observation, at all throwing in doubt this general proposition. Whenever the question has been there agitated, it has been in connection with the operation of the statute upon this right. The case of Miller v. Taylor, 4 Burr. 2303, decided in the year 1769, was the first determination in the court of king's bench upon the common law right of literary property. In that case the broad question is stated and examined, whether the copy of a book or literary composition belongs to the author by the common law ; and three of the judges, including Lord Mansfield, decided in the affirmative. Mr Justice Yeates dissented. But I am not aware that upon this abstract question a contrary decision has ever been made in England. This would seem to be sufficient to put at rest that general question, and render it unnecessary to go into a very particular examination of the reasons and grounds upon which the decision was founded. The elaborate examination bestowed upon the question by the judges in that case, has brought into view, on both sides of the question, the main arguments of which the point is susceptible. The great principle on which the author's right rests, is, that it is the

fruit or production of his own labour, and which may, by the labour of the faculties of the mind, establish a right of property, as well as by the faculties of the body; and it is difficult to perceive any well founded objection to such a claim of right. It is founded upon the soundest principles of justice, equity and public policy. Blackstone, in his Commentaries, 2d vol. 405, has succinctly stated the principle, that when a man, by the exertion of his rational powers, has produced an original work, he seems to have clearly a right to dispose of that identical work as he pleases; and any attempt to vary the disposition he has made of it, appears to be an invasion of that right. That the identity of a literary composition consists entirely in the sentiment and the language. The same conception, clothed in the same words, must necessarily be the same composition; and whatever method be taken to exhibit that composition to the ear or to the eye of another, by recital, by writing, or by printing, in any number of copies, or at any period of time, it is always the identical work of the author which is so exhibited; and no other man, it has been thought, can have a right to exhibit it, especially for profit, without the author's consent. The origin of this right is not probably to be satisfactorily ascertained, and indeed if it could, it might be considered an objection to its existence as a common law right; but from the time of the invention of printing, in the early part of the fifteenth century, such a right seems to have been recognized. The historical account of the recognition of the right, is to be collected from the discussions in Miller v. Taylor. The Stationers Company was incorporated in the year 1556, and from that time to the year 1640 the crown exercised an unlimited authority over the press, which was enforced by the summary process of search, confiscation and imprisonment, given to the Stationers Company, and executed by the then supreme jurisdiction of the star chamber. In the year 1640 the star chamber was abolished; and the existence of copyrights before that period, upon principles of usage, can only be looked for in the Stationers Company, or the star chamber or acts of state; and the evidence upon this point, says Mr Justice Wills, is liable to little suspicion. It was indifferent to the views of government whether the property of an innocent book licensed, was open or private property.

It was certainly against the power of the crown to allow it. as private property, without being protected by any royal privilege. It could be done only on principles of private justice, moral fitness and public convenience, which, when applied to a new subject, make common law, without a precedent; much more when received and approved by usage. And in this case of Miller v. Taylor, it was found by the special verdict, "that before the reign of her late majesty, queen Anne, it was usual to purchase from authors the *perpetual copyright* of their books, and to assign the same from hand to hand for valuable consideration, and to make the same the subject of family settlements, for the provision of wives and children." This usage is evidence of the common law, and shows that the copyright was considered and treated as property, transferable from party to party; and property, too, of a permanent nature, suitable for family settlement and provisions.

Common law, says Lord Coke, 1 Inst. 1, 2, is sometimes called right, common right, common justice. And Lord Mansfield says, the common law is drawn from the principles of right and wrong, the fitness of things, convenience and policy. And it is upon these principles that the copyright of authors is protected. After the year 1640, when the press became subject to license, the various ordinances and acts of parliament referred to in Miller v. Taylor, and collected in Maugham's treatise on the Law of Literary Property, p. 13—16, necessarily imply, and presuppose, the existence of a common law right in the author.

The common law, says an eminent jurist, 2 Kent's Comm. 471, includes those principles, usages and rules of action, applicable to the government and security of person and property which do not rest for their authority upon any express and positive declaration of the will of the legislature. A great proportion of the rules and maxims which constitute the immense code of the common law, grew into use by gradual adoption, and received, from time to time, the sanction of the courts of justice, without any legislative act or interference. It was the application of the dictates of natural justice, and of cultivated reason, to particular cases. In the just language of sir Matthew Hale, the common law of England is not the product of the wisdom of some one man, or society of men, in any

one age, but of the wisdom, counsel, experience and observation of many ages of wise and observing men. And, in accordance with these sound principles, and as applicable to the subject of copyright, are the remarks of Mr Christian, in his notes to Blackstone's Commentaries, 2 Bl. Comm. 06, and note. Nothing, says he, is more erroneous, than the practice of referring the origin of moral rights, and the system of natural equity, to the savage state, which is supposed to have preceded civilized establishments, in which literary composition, and, of consequence, the right to it, could have no existence. But the true mode of ascertaining a moral right, is to inquire whether it is such as the reason, the cultivated reason of mankind must necessarily assent to. No proposition seems more conformable to that criterion, than that every one should enjoy the reward of his labour, the harvest where he has sown, or the fruit of the tree which he has planted. Whether literary property is sui generis, or under whatever denomination of rights it may be classed, it seems founded upon the same principle of general utility to society, which is the basis of all other moral rights and obligations. Thus considered, an author's copyright ought to be esteemed an invaluable right, established in sound reason and abstract morality.

It is unnecessary, for the purpose of showing my views upon this branch of the case, to add any thing more. In my judgment, every principle of justice, equity, morality, fitness and sound policy concurs, in protecting the literary labours of men, to the same extent that property acquired by manual labour is protected. The objections to the admission of the common law right of authors, are generally admitted to be summed up, in all their force and strength, by Mr Justice Yeates, in the case of Miller v. Taylor. These objections may be classed under two heads: the one founded upon the nature of the property or subject matter of the right claimed; and the other on the presumed abandonment of the right by the author's publication.

The first appears to me to be too subtle and metaphysical to command the assent of any one, or to be adopted as the ground of deciding the question. It seems to be supposed, that the right claimed is to the ideas contained in the book. The claim, says Mr Justice Yeates, is to the style and ideas of the author's composition; and it is a well established maxim, that

nothing can be an object of property which has not a corporal substance. The property claimed is all ideal; a set of ideas which have no bounds or marks whatever—nothing that is capable of a visible possession—nothing that can sustain any one of the qualities or incidents of property. Their whole existence is in the mind alone. Incapable of any other modes of acquisition or enjoyment than by mental possession or apprehension; safe and invulnerable from their own immateriality, no trespass can reach them, no tort affect them; no fraud or violence diminish or damage them. Yet these are the phantoms which the author would grasp and confine to himself; and these are what the defendant is charged with having robbed the plaintiff of.

He asks, can sentiments themselves (apart from the paper on which they are contained) be taken in execution for a debt; or if the author commits treason or felony, or is outlawed, can the ideas be forfeited? Can sentiments be seized; or, by any act whatever, be vested in the crown? If they cannot be seized, the sole right of publishing them cannot be confined to the author. How strange and singular, says he, must this extraordinary kind of property be, which cannot be visibly possessed, forfeited or seized, nor is susceptible of any external injury, nor, consequently, of any specific or possible remedy.

These, and many other similar declarations are made by Mr Justice Yeates, to illustrate his view of the nature of a copyright. And he seems to treat the question, as if the claim was to a mere idea, not embodied or exhibited in any tangible form or shape. No such pretension has ever been set up, that I am aware of, by any advocate of the right to literary property. And this view of it would hardly deserve a serious notice, had it not been taken by a distinguished judge. Lord Mansfield, in the case of Miller v. Taylor, in defining the nature of the right or copyright, says, " I use the word copy in the technical sense in which that name or term has been used for ages, to signify an incorporeal right to the sole printing and publishing of something intellectual, communicated by letters;" and this is the sense in which I understand the term copyright always to be used, when spoken of as property.

The other objection urged by Mr Justice Yeates, that the publication by the author is an abandonment of the exclusive

right, rests upon more plausible grounds, but is equally destitute of solidity.

This would seem, according to his view of the case, the main point in the cause. The general question, he says, is, whether, after a voluntary and *general publication* of an author's work by himself, or by his authority, the author has a sole and perpetual property in that work, so as to give him a right to confine every subsequent publication to himself, or his assigns, for ever.

And he lays down this general proposition. That the right of publication must for ever depend on the claimant's property in the thing to be published. Whilst the subject of publication continues his own exclusive property, he will so long have the sole and perpetual right to publish it. But whenever that property ceases, or by any act or event becomes common, the right of publication will be equally common. The particular terms in which Mr Justice Yeates states his proposition, are worthy of notice. He puts the case upon its being a *general publication*, the meaning of which undoubtedly is, that the publication is without any restriction expressed or implied, as to the use to be made of it by the party into whose hands it might come, by purchase or otherwise. Unless such was his meaning, the proposition, I presume, no one will contend, can be maintained. Suppose an express contract made with a party who shall purchase a book, that he shall not republish it; this surely would be binding upon him.

So, if the bookseller should give a like notice of the author's claim, and a purchase of a book made without any express stipulation not to republish, the law would imply an assent to the condition. And any circumstances from which such an undertaking could be reasonably inferred, would lead to the same legal consequences. The nature of the property, and the general purposes for which it is published and sold, show the use which is to be made of it. The usual and common object which a person has in view in the purchase of a book is for the instruction, information or entertainment to be derived from it, and not for republication of the work. It is the use of it for these purposes which is implied in the sale and purchase. And this use is in subordination to the antecedent and higher right of the author; and comes strictly within the maxim, sic utere

tuo ut alienam non lædas. But the case is not left to rest on any implied notice of the author's claim, and the conditions on which he makes it public. This is contained on the title page of the very book purchased, and cannot be presumed to escape the notice of the purchaser. It is there, in terms, announced, that the author claims the right of publication; and whoever purchases, therefore, does it with notice of such claim, and is bound to use it in subordination thereto. Mr Justice Yeates admits, that every man is entitled to the fruits of his own labour; but that he can be entitled to it only, subject to the general rights of mankind, and the general rules of property; and that there must be a limitation to such right, otherwise the rights of others are infringed. The force of such limitation upon the right, is not readily perceived. If the right exists, it is a common law right, growing out of the natural justice of the case; being the result of a man's own labour. He thinks the statute of Anne fixes a just limitation. But suppose no statute had been passed on the subject; where would have been the limitation? The right existing, who would have authority to say where it should end? It must necessarily be without limitation, and it is no infringement of the rights of others. They enjoy it for the purpose intended, and according to the nature of the property. The purchaser of the book has a right to all the benefit resulting from the information or amusement he can derive from it. And if, in consequence thereof, he can write a book on the same subject, he has a right so to do. But this is a very different use of the property from the taking and publishing the very language and sentiment of the author; which constitute the identity of his work.

Mr Justice Yeates puts the effect of a publication upon the ground of intent in the author. The act of publication, says he, when voluntarily done by the author, is virtually and necessarily a gift to the public. And he must be deemed to have so intended it. But no such intention can surely be inferred, when the contrary intention is inscribed upon the first page of the book, which cannot escape notice.

The case of Percival v. Phipps, 2 Ves. and Beam. 19, recognises the implied prohibition against publishing the work of another, arising from the very nature of the property. It was held in that case, that private letters, having the character

of literary composition, were within the spirit of the act protecting literary property, and that by sending a letter, the writer did not give the receiver authority to publish it; and this is the doctrine of Lord Hardwicke in Pope v. Carl, 2 Atk. 342, where it is said that familiar letters may form a literary composition, in which the author retains his copyright, and does not, by sending them to the person to whom they are addressed, authorise him or a third person to use them for the purpose of profit, by publishing them against the interest and intention of the author. That by sending the letter, though he parts with the property of the paper, he does not part with the property of copyright in the composition.

But how stands the case, with respect to the effect of publication by the author, according to Mr Justice Yeates's own rule. He says, " in all abandonments of such kind of property, two circumstances are necessary," an actua relinquishing the possession, and an *intention* to relinquish it. 'That the author's name being inserted in the title page is no reason against the abandonment; for many of our best and noblest authors have published their works from more generous views than pecuniary profit. Some have written for fame, and the benefit of mankind. That the omission of the author's name can make no difference; for if the property be absolutely his, he has no occasion to add his name to the title page. He cannot escape, it seems, from calling the copyright *property*, although a mere *idea*; and resorts again to his favourite theory, that it has no indicia, no distinguishing marks to denote his proprietary interest therein; and hard, says he, would be the law, that should adjudge a man guilty of a crime, when he had no possibility of knowing that he was doing the least wrong to any individual. That he could not know who was the proprietor of these intellectual ideas, they not having any ear-marks upon them, or tokens of a particular proprietor.

If, as Mr Justice Yeates admits, it is a question of *intention* whether the author meant to abandon his work to the public, and relinquish all private or individual claims to it, no possible doubt can exist as to the conclusion in the present case. Would a jury hesitate a moment upon the question under the evidence before the court? The right set up and stamped upon the title *page* of the book, shuts the door against any infer-

ence, that the publication was intended to be a gift to the public.

Mr Justice      tes admits, that so long as a literary composition is in man    :ipt, and remains under the sole dominion of the author, it is his exclusive property. It would seem, therefore, that the *idea* when once reduced to writing, is susceptible of identity, and becomes the subject of property. But property without the right to use it, is empty sound, says Mr Justice Aston in Miller v. Taylor. And, indeed, it would seem a mere mockery for the law to recognize any thing as property, which the owner could not use safely and securely for the purposes for which it was intended, unless interdicted, by the principles of morality or public policy.

It is not necessary that I should go into any particular examination of the construction of the statute of Anne, or to what extent it may affect the common law right of authors in England ; because, as I shall hereafter show, that statute was never considered in force in Pennsylvania. The mere common law right, uninfluenced by that statute, is alone drawn in question under this branch of the case. And the decision in the case of Miller v. Taylor, would seem to put that question at rest in England, at that day. Mr Justice Yeates, in aid of his opinion, relied much upon that statute ; arguing that from the title, which is an "act for the encouragement of learning by *vesting* the copies of printed books in the authors or purchasers of such copies during the times therein mentioned ;" and from the provision in the act, that the *sole right* should be vested, &c. for twenty-one years and *no longer;* the right was *created*, and limited by the act, and did not rest upon the common law. The other three judges, however, maintained, that an author's right was not derived from the statute, but that he had an original perpetual common law right and property in his work, and that the statute was only cumulative, and giving additional remedies for a violation of the right. That the preamble in the act proceeds upon the ground of a right of property in the author having been violated ; and that the act was intended as a confirmation of such right. And that from the remedy enacted against the violation of the right being only temporary, it might be argued, that it afforded an implication, that there existed no right but what was

secured by the act. To guard against which, there is an express saving in the ninth section of the act. "Provided that nothing in this act contained, shall extend or be construed to extend either to prejudice or confirm *any right*, that the said universities or any of them, *or any person or persons*, have or claim to have to the printing or reprinting, any book or copy already printed or hereafter to be printed." That the words *any right*, manifestly meant any *other* right, than the term secured by the act. It may be observed here, that whatever may be the just weight to be given to the term "*vested*" and the words "*no longer*," as used in the statute of Anne, and so much relied on by Mr Justice Yeates, have no application to our acts of congress; no such term or provision being used. A writ of error was brought in this case of Miller v. Taylor, but afterwards abandoned, and the law was considered settled, until called in question in Donaldson v. Beckett, 4 Burr. 2408, which came before the house of lords in the year 1774, upon an appeal from a decree of the court of chancery, founded upon the judgment in Miller v. Taylor.

Upon this appeal certain questions were propounded to the twelve judges. Lord Mansfield, however gave no opinion, it being very unusual, as the reporter states, from reasons of delicacy, for a peer to support his own judgment upon appeal to the house of lords. This statement necessarily implies, however, that he had not changed his opinion. There were, therefore, eleven judges who voted upon the questions.

One of the questions propounded was : whether, at common law, an author of any book or literary composition, had the sole right of *first printing* and publishing the same for sale, and might bring an action against any person who printed, published and sold the same without his consent.

Upon this question ten voted in the affirmative, and one in the negative.

Another question was : if the author had such right originally, *did the law take it away, upon his printing and publishing* such book or literary composition, and might any person, afterwards, reprint and sell, for his own benefit, such book or literary composition, against the will of the author.

Upon this question seven were in the negative, and four in the affirmative.

The vote upon these two questions settled the point, that, by the common law, the author of any literary composition, and his assigns, had the sole right of printing and publishing the same in perpetuity.

Another question propounded was : if an action would have lain, at common law, is it taken away by the statute of Anne ? and is an author, by the said statute, precluded from every remedy, except on the foundation of the statute, and on the terms and conditions prescribed thereby ?

Upon this question, six voted in the affirmative, and five in the negative ; and it will be perceived, that if Lord Mansfield had voted on this question, and in conformity with his opinion in Miller v. Taylor, the judges would have been equally divided.

That the law in England has not been considered as settled, in conformity with the vote on this last question, is very certain. For it is the constant practice, in chancery, to grant injunctions to restrain printers from publishing the works of others, which practice can only be sustained on the ground that the penalties given by the statute, are not the only remedy that can be resorted to. In Miller v. Taylor, Lord Mansfield says, the whole jurisdiction exercised by the court of chancery, since 1710, the date of the statute of Anne, against pirates of copies, is an authority that authors had a property antecedent, to which the act gives a temporary additional *security.* It can stand upon no other foundation. And in the case of Beckford v. Hood, 7 Term Rep. 616, it was decided, that an author whose work is pirated before the expiration of the time limited in the statute, may maintain an action on the case for damages, against the offending party. Lord Kenyon says, the question is, whether the right of property being vested in authors for certain periods, the common law remedy for a violation of it, does not attach within the time limited by the act of parliament. Within those periods, the act says, that the author shall have the sole right and liberty of printing, &c. Thus the statute having vested that right in the author, the common law gives the remedy by action in the case for violation of it ; and that the meaning of the act in creating the penalties, was to give an accumulative remedy. And in this all the judges concurred. And Mr Justice Grose ob-

serves, that in the great case of Miller v. Taylor, Mr Justice Yeates gave his opinion against the common law right of authors; but he was decidedly of opinion, that an exclusive right of property was vested by the statute for the time limited; and he says, that by the decision in the house of lords of Donaldson v. Beckett, the common law right of action is not considered as taken away by the statute of Anne, but that it could not be exercised beyond the time limited by that statute : and it is worthy of notice that this action on the case, for damages, was sustained, although the work was not entered at Stationers Hall, nor the author's name affixed to the first publication. This, Lord Kenyon observes, was to serve as a notice and warning to the public, that none might ignorantly incur the penalties and forfeitures given against such as pirate the works of others. But calling on a party who has injured the civil property of another, for a remedy in damages, cannot properly fall under the description of a forfeiture or penalty.

From this view of the law, as it stands in England, it is very clear that, previous to the statute of Anne, the perpetual common law right of authors, was undisputed. That after that statute, in the case of Miller v. Taylor, it was held, that this common law right remained unaffected by the statute, which only gave a cumulative remedy. That the subsequent case of Donaldson v. Beckett, limited the right to the times mentioned in the statute. But that for all violations of the right during that time, all the common law remedies continued, although no entry of the work at Stationers Hall had been made, according to the provisions of the statute. Such entry being necessary, only for the purpose of subjecting the party violating the right, to the penalties given by the act.

I do not deem it necessary particularly to inquire, whether, as an abstract question, the same reasons do not exist for the protection of mechanical inventions, as the production of mental labour. The inquiry is not, whether it would have been wise to have recognized an exclusive right to mechanical inventions. It is enough, when we are inquiring what the law is, and not what it ought to have been, to find that no such principle ever has been recognized by any judicial decision. The argument was urged with great earnestness by Mr Justice Yeates in Miller v. Taylor, but repudiated by Lord Mansfield and the other

judges. With respect to copyrights, however, the law has been considered otherwise ; and the original common law right fully established, though modified in some respects by the statute of Anne.

I shall proceed, now, to some notice of the light in which copyrights have been viewed in this country.

It appears from the journals of the old congress (8 Journals 257), that this question was brought before that body by sundry papers and memorials on the subject of literary *property;* and which were referred to a committee, of which Mr Madison was one ; and on the 27th of May 1783, the following resolution was reported and adopted.

" Resolved, that it be recommended to the several states, to *secure* to the authors or publishers of any new books not hitherto printed, being citizens of the United States, and to their executors, administrators and assigns, the copyright of such books for a certain time, not less than fourteen years from the first publication ; and to *secure* to the said authors, if they shall survive the term first mentioned; and to their executors, administrators and assigns, the copyright of such books for another term or time, not less than fourteen years ; such copy or exclusive right of printing, publishing and vending the same, to be *secured* to the original authors or publishers, their executors, administrators and assigns, by such laws and such restrictions, as to the several states may seem proper."

This right is here treated and dealt with as property already existing; and not as creating any thing which had previously no being. It is spoken of as something tangible, that might pass to executors and administrators, and transferable by assignment. And the recommendation to the states was, to pass laws to *secure* such right.

It must be presumed, that congress understood the light in which this subject was viewed in the mother country. And it is deserving of notice, that Mr Madison, one of the committee, afterwards wrote the number in the Federalist, where this subject is discussed; and where it is expressly asserted, that this has been adjudged in England to be a right at common law.

And it is worthy of remark also, that no mention is here made of any right in mechanical inventions : and although the arts and sciences are connected in the same clause in the con-

stitution, and placed under the legislative power of congress, it does not, by any means follow, that they were considered as standing on the same footing.

Several of the states had already passed laws on this subject; and many others, in compliance with the recommendation of congress, did the same.

The state of Massachusetts, as early as March 1783, passed a law, entitled, "an act for the purpose of *securing* to authors, the exclusive right and benefit of publishing their literary productions for twenty-one years." The preamble to this act shows, in a strong and striking manner, the views entertained at that day in this enlightened state, of the value of this right. "Whereas, the improvement of knowledge, the progress of civilization, the public weal of the community, and the advancement of human happiness greatly depend on the efforts of learned and ingenious persons, in the various arts and sciences; as the principal encouragement such persons can have, to make great and beneficial exertions of this nature, must exist in the legal security of the fruits of their study and industry, to themselves; and as such security is one of the natural rights of all men, there being no *property* more peculiarly a man's own, than that which is produced by the labour of his mind: therefore, to encourage learned and ingenious persons to write useful books, for the benefit of mankind, be it enacted," &c. The act then proceeds to declare, that all books, treatises and other literary works, &c. shall be the sole property of the author or authors, being subjects of the United States of America, their heirs and assigns, for the full and complete term of twenty-one years from the date of their first publication. And certain penalties are affixed to a violation of the right, with a proviso, that the act shall not be construed to extend in favour, or for the benefit of any author, or subject of any other of the United States, until the state of which such author is a subject, shall have passed similar laws for securing to authors the exclusive right and benefit of publishing their literary productions. 1 Laws Mass. 94.

This act recognizes in the fullest and most unqualified manner, the natural right which an author has to the productions and labour of his own mind. And it is worthy of notice, that the act does not recognize as a natural right, or in any manner

provide for the protection of mechanical inventions; thereby showing the distinction between mental and manual labour in the view of that legislature, although it is now attempted to put them on the same footing.

The state of Connecticut had, previously, in the same year (January 1783), passed an act for the encouragement of literature and genius, containing the following preamble: "whereas it is perfectly agreeable to the principles of natural justice and equity, that every author should be *secured* in receiving the profits that may arise from the sale of his works; and such security may encourage men of learning and genius to publish their writings, which may do honour to their country, and service to mankind." Certain provisions are then made for the security of such right, which it is unnecessary here to be particularly noticed.

There is a like proviso as in the Massachusetts act: that the benefit of the law is not to extend to authors, inhabitants of, or residing in other states, until such states have passed similar laws. Statutes of Conn. 474. This law is also confined to literary productions, and in no manner extending to mechanical labours.

In the colony of New York, in the year 1786, a law "to promote literature" was passed, reciting, "whereas, it is agreeable to the principles of natural equity and justice, that every author should be *secured* in receiving the profits that may arise from the sale of his works; and such security may encourage persons of learning and genius to publish their writings, which may do honour to their country, and service to mankind;" and then making provision, for securing to authors the sole right of printing, publishing and selling their works for fourteen years. With a proviso to the fourth section of the act, recognizing a common law right; but leaving it open and unaffected in cases not coming within the act: viz., "provided, that nothing in this act shall extend to, affect, prejudice or confirm the rights which any person may have to the printing or publishing of any books or pamphlets at *common law*, in cases not mentioned in this act."

The state of Virginia also, in the year 1785, passed a similar law, for *securing* to authors of literary works, an exclusive property therein, for a limited time. 1 Rev. Code 534. Like

laws for the same purpose were passed by other states, which are not necessary here to be noticed; enough having been referred to, to show the light in which literary property was viewed in this country ; and that such laws were passed, with a view to protect and secure a pre-existing right, founded on the eternal rules and principles of natural right and justice, and recognized by the common law.

But under the existing governments of the United States, before the adoption of the present constitution, adequate protection could not be given to authors throughout the United States, by any general law. It depended on the legislatures of the several states ; and this led to the provisions in the present constitution, giving to congress power " to promote the progress of science and the useful arts, by *securing*, for limited times, to authors and inventors, the exclusive right to their respective writings and discoveries." Constit. art. 1, sect. 8.

It has been argued at the bar, that as the promotion of the progress of science and the useful arts, is here united in the same clause in the constitution, the rights of authors and inventors were considered as standing on the same footing ; but this, I think, is a non sequitur. This article is to be construed distributively, and must have been so understood ; for when congress came to execute this power by legislation, the subjects are kept distinct, and very different provisions are made respecting them. All the laws relative to inventions, purport to be acts to promote the progress of the useful arts. They do not use any language which implies or presupposes any existing prior right *to be secured;* but clearly imply that the whole exclusive right is created by the law, and ends with the expiration of the patent. The first law, passed in the year 1790, 1 Story's Ed. 80, requires that the specification shall be so particular, as not only to distinguish the invention or discovery from other things before known and used, but also to enable a workman, or other person, skilled in the art or manufacture, to make, construct, or use the same, *to the end that the public may have the full benefit thereof, after the expiration of the patent term.* This is the consideration demanded by the public, for the protection during the time mentioned in the patent ; and the books furnish no case, that I am aware of, where an ac-

tion has been attempted to be sustained upon any supposed common law right of the inventor. '

But the case is quite different with respect to copyrights. All the laws on this subject purport to be made for *securing* to authors and proprietors such copyright. They presuppose the existence of a right, which is to be secured, and not a right originally created by the act. The security provided by the act is for a limited time. But there is no intimation that at the expiration of that time the copy becomes common, as in the case of an invention. The right, at the expiration of the time limited in the acts of congress, is left to the common law protection, without the additional security thrown around it by the statutes; and stands upon the same footing as it did before the statutes were passed. The protection for a limited time by the aid of penalties, against the violators of the right, proceeds upon the ground that the author, within that time, can so multiply his work, and reap such profits therefrom, as to enable him to rest upon his common law right, without the extraordinary aid of penal laws.

In the Federalist, No. 43, written by Mr Madison, who reported the resolution referred to, in the old congress, this clause in the constitution is under consideration, and the writer observes : that the utility of this power will scarcely be questioned. *The copyright of authors has been solemnly adjudged in Great Britain, to be a right at common law.* The right to useful inventions seems, with equal reason, to belong to the inventors. The public good fully coincides, in both cases, with the claims of individuals. The states cannot separately make effectual provision for either of the cases; and most of them have anticipated the decision of this point, by laws passed at the instance of congress.

Although it is here said, that the right to useful inventions seems with equal reason to belong to the inventors, as the copyright to authors : yet it is not pretended that the common law equally recognises them. But the contrary is necessarily implied, when it is expressly said that the copyright has been adjudged to be a common law right, but is silent as to inventors' rights.

The common law right of authors is expressly recognised by Mr Justice Story in his Commentaries. In noticing this

686 .

article in the constitution, he says, "this power did not exist under the confederation, and its utility does not seem to have been questioned. The copyright of authors in their works had, before the revolution, been decided in Great Britain to be a common law right, and it was regulated and limited under statutes passed by parliament upon that subject." 3 Story's Com. 48. If these statutes do not affect the right in the case now before the court, it remains and is to be viewed as a common law right.

The judge in the court below, who decided this case, seems to place much reliance on what he considers a doubt, suggested by Chancellor Kent, as to the existence of the common law right. Let us see what he does say. "It was," says he, "for some time the prevailing and better opinion in England, that authors had an exclusive copyright at common law, as permanent as the property of an estate ; and that the statute of . Anne, protecting by penalties that right for fourteen years, was only an additional sanction, and made in affirmance of the common law. This point came at last to be questioned, and it became the subject of a very serious litigation in the court of king's bench. It was decided in Miller v. Taylor, 1769, that every author had a common law right in perpetuity, independent of statute, to the exclusive printing and publishing his original compositions. The court was not unanimous, and the subsequent decision of the house of lords, in Donaldson v. Beckett, in February 1774, settled this very litigated question against the opinion of the king's bench, by establishing, that the common law right of action, *if any existed,* could not be exercised beyond the time limited by the statute of Anne, 2 Com. 375, second ed. It is here fully admitted, that by the decision in Miller v. Taylor, every author had a common law right in perpetuity, to the publishing of his original composition. And, if it was intended to intimate, that the subsequent decision, in Donaldson v. Beckett, overruled this decision, as to the common law right ; I apprehend, this must be a mistake, according to the report of the case in 4 Burr. I understand the decision then was, by ten of the judges, that at common law an author had the sole right of *first printing* and publishing his work, and by seven judges to four, that such right continued after his *first publication.* It is true, it

was decided by six to five of the judges, that the common law right of action could not be exercised beyond the time limited by the statute of Anne. But with the construction of this statute, we have no concern, if it was not in force in Pennsylvania. The settlement of the common law right is the material point, and that is admitted, by Chancellor Kent, to have been decided in favour of the author. There is certainly considerable obscurity in the report of this case, as to how far it has modified the common law remedy: this arises probably from the manner in which the questions were propounded by the house of lords to the judges.

I do not perceive how it becomes necessary in this case to decide the question, whether we have here any code of laws, known and regarded as the common law of the United States. This case presents a question respecting the right of property, and in such cases the state laws form the rules of decision in the courts of the United States; and the case now before the court must be governed by the law of copyright in the state of Pennsylvania. The complainants, though citizens of New York, are entitled to the benefit of those laws for the protection of their property; and have a right to prosecute their suit in the courts of the United States.

If, by the common law of England, an author has the copyright in his literary compositions, it becomes necessary to inquire whether that law is in force in the state of Pennsylvania.

It was very properly admitted by the court below, on the trial of this cause, that when the American colonies were first settled by our ancestors, it was held as well by the settlers, as by the judges and lawyers of England, that they brought with them, as a birthright and inheritance, so much of the common law as was applicable to their local situation and change of circumstances; and that each colony judged for itself, what parts of the common law were applicable to its new condition. Mr Justice Story recognises the same principle in his Commentaries, vol. 1, 137 to 140. Englishmen, says he, removing to another country, must be deemed to carry with them those rights and privileges which belong to them in their native country; and that the plantations formed in this country were to be deemed a part of the ancient domin-

ions, and the subjects inhabiting them to belong to a common country, and to retain their former rights and privileges. That the universal principle has been (and the practice has conformed to it), that the common law is our birthright and inheritance, and that our ancestors brought hither with them, upon their immigration, all of it which was applicable to their situation. The whole structure of our present jurisprudence stands upon the original foundation of the common law. The old congress, in the year 1774, unanimously resolved, that the respective colonies are entitled to the common law of England. 1 Story's Com. 140, and note.

The colony of Pennsylvania was settled about the year 1682; at which period, and down to the time of the case of Miller v. Taylor, 1769, the whole course of the British government, as well in parliament, as in the star chamber, and court of chancery, proceeded, in relation to the regulation of copyrights, upon the ground of an existing common law right in authors: and which was so universally acknowledged, that it was not contested in a court of justice until that case; and then solemnly, and upon the most mature deliberation, decided to be a common law right, notwithstanding the statute of Anne passed in the year 1710. And the subsequent decision of Donaldson v. Beckett, turned entirely upon the construction of that act, which it was supposed limited the remedy to the time prescribed in the act for the protection of the copyright. So that at the time of the settlement of Pennsylvania, and for nearly a century thereafter, the common law right with all the comn on law remedies attached to it, was the received and acknowledged doctrine in England. And if the common law was brought into Pennsylvania by the first settlers, the law of copyright formed a part of it, and was in force there, and has so continued ever since, not having been abolished or modified by any legislature in that state. But the existence of the common law in Pennsylvania, is not left to inference upon the general principles applicable to emigrants, before alluded to; there is positive legislation on the subject.

We find, as early as the year 1718, a law in that colony with a recital, " whereas king Charles II., by his royal charter to William Penn, for erecting this country into a province, did declare it to be his will and pleasure, that the laws for re-

gulating and governing of property, within the said province, as well for the descent and enjoyment of lands, as for the enjoyment and succession of goods and chattels, and likewise as to felonies, should be and continue the same as they should be, for the time being, by the general course of the law in the kingdom of England, until the said laws shall be altered by the said William Penn, his heirs and assigns, and by the freemen of the said province, their delegates or deputies, or the greater part of them : and whereas it is a settled point, that as the common law is the birthright of all English subjects, so it ought to be their rule in the British dominions. But acts of parliament have been adjudged not to extend to these plantations, unless they are particularly named as such : now, therefore," &c. : and certain statutes relating to crimes are adopted ; and this question came under the consideration of the supreme court of that state, in the case of Morris's Lessee v. Van Dorin, 1 Dall. 64, in the year 1782, and Chief Justice M'Kean, in pronouncing the judgment of the court, says : this state has had her government for above a hundred years, and it is the opinion of the court, that the common law of England has always been in force in Pennsylvania. That all statutes made in Great Britain before the settlement of Pennsylvania, have no force here, unless they are convenient, and adapted to the circumstances of the country ; and that all statutes made *since the settlement of Pennsylvania,* have no force here, unless the colonies are particularly named ; and he adds, that the spirit of the act of 1718 supports this opinion.

With respect to English statutes which have been considered in force in Pennsylvania, we have the most satisfactory evidence in the report of the judges of the supreme court of that state, made under an act of the legislature passed April 7th, 1807, 3 Binn. 395, by which the judges were required to examine, and report, which of the English statutes are in force in that commonwealth ; and upon this subject the report states : " with respect to English statutes, enacted since the settlement of Pennsylvania, it has been assumed, as a principle, that they do not extend here, unless they have been recognized by our acts of assembly, or adopted by long continued practice in courts of justice. Of the latter description there are very few ; and those, it is supposed, were introduced from a sense of their

evident utility. As English statutes, they had no obligatory force; but, from long practice, they may be considered as incorporated with the law of our country."

From this review of the law, I think I have shown, that, by the common law of England, down, at least, to the decision in the case of Donaldson v. Beckett, an author was considered as having an exclusive right, in perpetuity, to his literary compositions. That this right, as a branch of the common law, was brought into Pennsylvania with the first settlers, as early as the year 1682. That whatever effect and operation the statute of Anne may have been deemed to have had upon the common law in England, that statute never having been in force in Pennsylvania, the common law right remains unaffected by it. And with this view of the law, and the rights of an author, I proceed to consider the acts of congress which have been passed on this subject.

Observing, in the first place, that we are bound to presume that congress understood the nature and character of this claim of authors to the enjoyment of the fruits of their literary labours, and the ground upon which it rested. This is useful and necessary, to conduct us to a right understanding of their legislation. A knowledge of the mischief is necessary, to a just and correct view of the remedy intended to be applied.

But the knowledge of congress on this subject is not left open to presumption. The question, as to its being an exclusive and perpetual right, was brought directly to the view of congress.

Three acts have been passed on this subject; and being not only in pari materia, but connected with each other by their very titles and objects, are to be construed together, and explained by each other.

The last act on the subject was passed in the year 1831, and is entitled " an act to amend the several acts respecting copyrights, approved February 3d, 1831." And the report of the judiciary committee, to whom the subject was referred, shows in what point of light the subject was presented to congress.

Your committee, says the report, believe that the just claims of authors, require from our legislation a *protection*, not less than what is proposed in the bill reported. From the first principles of proprietorship *in property, an author has an exclusive*

*and perpetual right*, in preference to any other, to the fruits of his labour. Though the nature of literary property is peculiar, it is not the less real and valuable. If labour and effort in producing what before was not possessed or known will give title, then the literary man has title, perfect and absolute, and should have his reward.

The object of the law, and to which the attention of congress was specially drawn, was the *protection* of property; claimed and admitted to be exclusive and perpetual in the author.

It may be useful, preliminarily, to notice a few of the settled rules by which statutes are to be construed.

In construing statutes, three points are to be regarded; the old law, the mischief, and the remedy; and the construction should be such, if possible, to suppress the mischief, and advance the remedy. 1 Bl. Com. 87 ; Bac. Ab. Stat. 1, pl. 31, 32.

An affirmative statute does not abrogate the common law.

If a thing is at common law, a statute cannot restrain it, unless it be in negative words. Plowd. 113 ; 2 Kent's Com. 462 ; 2 Mason 451 ; 1 Inst. 111, 115 ; 10 Mod. 118. Bac. Abr. Stat. 9.

Where a statute gives a remedy, where there was one by the common law, and does not imply a negative of the common law remedy, there will be two concurrent remedies. In such case, the statute remedy is accumulative. 2 Bac. 803, 805 ; 2 Inst. 200 ; Com. Dig. Action upon Statute 6.

Considering the common law right of the author established, and with these rules of construing statutes kept in view, I proceed to the consideration of the acts of congress.

The first law was passed in the year 1790 (1 vol. Story's ed. of Laws of United States 94), and is entitled, "an act for the encouragement of learning, by *securing* the copies of maps, charts and books, to the authors and proprietors of such copies, during the times therein mentioned."

The first section declares, that the author of any book or books already printed, being a citizen of the United States, and who hath not transferred the copyright to any other person, and any other person, being a citizen of the United States, &c. who hath purchased, or legally acquired the copyright of such book, in order to print, reprint, publish or vend the same, shall have the *sole right* and liberty of printing, reprinting, publishing and

vending the same, for fourteen years *from the recording the title thereof* in the clerk's office, as hereinafter directed. The like, provision is made, with respect to books or manuscripts not printed, or thereafter composed. The title, and this section of the act, obviously consider and treat this copyright as property; something that is capable of being transferred; and the right of the assignee is protected equally with that of the author; and the object of the act, and all its provisions purport to be for *securing* the right. Protection is the avowed and real purpose for which it is passed. There is nothing here admitting the construction, that a new right is created. The provision in no way or manner deals with it as such. It in no manner limits or withdraws from the right, any protection it before had. It is a forced and unreasonable interpretation, and in violation of all the well settled rules of construction, to consider it as restricting, limiting or abolishing any pre-existing right. Statutes are not presumed to make any alteration in the common law, further or otherwise, than the act expressly declares. And, therefore, when the act is general, the law presumes it did not intend to make any alteration; for if such was the intention, the legislature would have so expressed it. 11 Mod. 148; 19 Vin. 512, Stat. E. 6, pl. 12. And hence the rule is laid down in Plowden, if a thing is at common law, a statute cannot restrain it, unless it be in negative words. It is in every sense an affirmative statute, and does not abrogate the common law.

The cumulative security or protection given by the statute, attaches *from the recording of the title of the book in the clerk's office of the district court where the author or proprietor shall reside.* If the statute should be considered as creating a new right, that right vests upon recording the title. This is the only prerequisite, or condition precedent, to the vesting the right. Whatever it is that is given by the statute, and the other requirements in the third and fourth sections, of publishing in the newspaper within two months from the date of the record, and delivering a copy of the book to the secretary of state within six months from the publication; cannot be construed as prerequisites or conditions precedent to the vesting. These provisions cannot be considered in any other light than as directory. In no other view can these sections of the law be

made consistent with the provisions of the first section. The benefit of the act, so far as respects the exclusive right, takes effect from the time of recording the title in the clerk's office : but the publication in the newspaper may be made at any time within two months, and the copy delivered to the secretary of state within six months. What would be the situation of the author if his copyright should be violated before the expiration of the time allowed him for these purposes ? Would he have no remedy ? The second section declares in terms, that if any person, from and after the *recording the title*, shall, without the consent of the author or proprietor, print or reprint, &c., he thereby incurs the penalties given by the act. Both the right and the remedy therefore given by the act, attach on the recording of the title. And this construction is not at all affected by any thing contained in the third section of the act ; which declares that no person shall be entitled to the benefit of this act, unless he shall have deposited a printed copy of the title in the clerk's office. This is in perfect harmony with the first and second sections ; and although the requirement to publish a copy of the record in the newspaper is in the same section, it is in a separate and distinct clause, and no more required to be considered a prerequisite, than if it was in a distinct section: and so it was considered by Mr Justice Washington in Ewer v. Coxe, 4 Wash. C. C. Rep. 490 ; and he also in that case considered the requirement in the fourth section to deliver a copy to the secretary of state as directory, and not as a condition: and indeed the result of his opinion was, that if the author's copyright depended upon the act of 1790, it would be complete by a deposite of a copy of the title in the clerk's office. But that the act of 1802 not only added another requisite, viz. causing a copy of the record to be inserted at full length in the title page, but made the publication in the newspaper, and the delivery of a copy of the book to the secretary of state, prerequisites, although not made so by the act of 1790. Mr Justice Washington is fully supported in his construction of the act of 1790 by the case of Nichols v. Ruggles, 3 Day 145, decided in the supreme court of errors of the state of Connecticut, where it is held, that the provisions of the statute, which require the author to publish the title of his book in a newspaper, and to deliver a copy of the work to the

secretary of state, are merely directory, and constitute no part. of the essential requisites for securing the copyright. This case was decided in the year 1808; and I do not find any reference to the act of 1802. This can only be accounted for upon the supposition that, in the opinion of the counsel and court, this act did not at all affect the construction of the act of 1790 ; for had it been supposed that the act of 1802 made the publication in a newspaper, and a delivery of a copy of the work to the secretary of state, prerequisites to the vesting of the copyright, it would necessarily have led to a different result on the motion for a new trial. Judge Hopkinson, who tried the cause now before the court, thinks the act of 1790 will not admit of the construction given to it by Judge Washington; but that under that act the publication in a newspaper, and delivery of a copy of the work to the secretary of state, are prerequisites to the establishment of the right ; and such I understand to be the opinion of a majority of this court, by which the construction of the act of 1790 by Judge Washington is overruled. I have already attempted to show that this construction of the act of 1790 cannot be sustained ; nor do I think that the act of 1802 will aid that construction of the act of 1790, and in this I understand my brother M'Lean concurs: so that upon this question, as to the effect of the act of 1802 upon the act of 1790, the court is equally divided, and the decision of the cause rests upon the act of 1790. A brief notice, however, of the act of 1802, 2 Story's Ed. Laws U. S. 866, may not be amiss.

It purports so far as it relates to the present question, to be a supplement to the act of 1790, and declares that the author or proprietor of a book, before he shall be entitled to the benefit of that act, shall, in addition to the requisites enjoined in the third and fourth section of said act, give information, by causing a copy of the record, required to be published in a newspaper, to be inserted at full length in the title page or in the page immediately following the title page of the book. It is to be observed, that this purports to be a supplementary act, the office of which is only to add something to the original act, but not to alter or change the provisions which it already contains. It leaves the original act precisely as it was, and only superadds to its provisions the matter of the supplement ; and

both, when taken together, will receive the same construction as if originally incorporated in the same act. This is the natural and rational view of the matter. Suppose this new requisite had been in the original act, how would it stand ? If it was in a separate and distinct section, it would run thus : that the author, before he shall be entitled to the benefit of this act, shall insert at full length, in the title page of the book, a copy of the record of the title. This could not change the construction of the act as to the publication in the newspaper, or delivery of a copy of the book to the secretary of state. Nor could it have any such effect, if it followed immediately after the prerequisite of depositing a printed copy of the title of the book in the clerk's office ; and this would have been the natural place for the provision, if it had been inserted in the original act.

Judge Washington, in Ewer v. Coxe, says that the supplemental act declares that the person seeking to obtain this right shall perform this new requisition, in addition to those prescribed in the third and fourth sections of the act of 1790, *and that he must perform the whole before he shall be entitled to the benefit of the act.* I find no such declaration in the act. The second section, which relates to prints, does contain this declaration, but it has no application to books.

If the act of 1802 is intended as a legislative construction of the act of 1790, and is clearly erroneous, it cannot be binding upon the court.

The act of 1831, being in pari materia, may be taken into consideration in construing the previous acts which it purports to amend ; and we find in this act only two prerequisites imposed upon an author, to entitle him to the benefit of the act, viz. to deposit a printed copy of the title of the book in the clerk's office of the district court of the district wherein the author or proprietor shall reside, and to give information of the copyright being secured, by inserting on the title page, or the page immediately following, the entry therein directed, viz. "entered according to the act of congress," &c. And these being prerequisites under the former laws, it is fairly to be concluded that they were the only prerequisites, and that the other requirements are merely directory ; and if so, the complainants in the court below, have shown all that the acts of

congress require to vest the copyright. The title has been recorded in the clerk's office, and a copy of the record inserted in the title page of the book.

But if the complainants in the court below have not made out a complete right under the acts of congress, there is no ground upon which the common law remedy can be taken from them. If there be a common law right, there certainly must be a common law remedy. The statute contains nothing in terms, having any reference to the common law right; and if such right is considered abrogated, limited or modified by the acts of congress, it must be by implication; and to so construe these acts, is in violation of the established rules of construction, that where a statute gives a remedy in the affirmative without a negative expressed or implied, for a matter which was actionable at common law, the party may sue at common law, as well as upon the statute. 1 Chitty's Pl. 144. This is a well settled principle, and fully recognized and adopted in the case of Almy v. Harris, 5 Johns. Rep. 175.

Whatever effect the statute of Anne may have had in England, as to limiting or abridging the common law right there; no such effect, upon any sound rules of interpretation, can grow out of our acts of congress. There is a wide difference in the phraseology of the laws. The statute of Anne contains negative words. It declares that the author shall have the sole right and liberty of printing, &c. for the time contained in the statute, and *no longer;* and these are the words upon which the advocates for the limitation of the common law right mainly rest: and it was, for a long time, considered by the ablest judges in England, that even these strong words did not limit or abridge the common law right; and the question, at this day, is not considered free from doubt.

This act, and the construction which it had received in England, were well known and understood when the act of congress was passed, and no such limitation is inserted or intended, or any matter at all repugnant to the continuance of the common law right, in its full extent. These laws proceed on the ground that the common law remedy was insufficient to protect the right, and provide additional security, by means of penalties, for the violation of it. Congress having before them the statute of Anne, and apprized of the doubt entertained in

England as to its effect upon the common law right, if it had been intended to limit or abridge that right, some plain and explicit provision to that effect would doubtless have been made ; and not having been made, is, to my mind, satisfactory evidence that no such effect was intended.

If the present action was to recover the penalties given by the statute, it might be incumbent on the appellants to show that all the requirements in the acts of congress had been complied with.  This would be resorting to the new statutory remedy, and the party must bring himself within the statute, in order to entitle him to that remedy.  But admitting that the right depends upon the statute, and is limited to the time therein prescribed, the remedy by injunction continues during that time.  This is admitted by Mr Justice Yeates, in Miller v. Taylor.  The author, says he, has certainly a property in the copy of his book, during the term the statute has allowed ; and whilst that term exists, it is like a lease, a grant or any other common law right ; and will equally entitle him to all common law remedies for the enjoyment of that right.  He may, I should think, file an injunction bill to stop the printing.  But I may say with more positiveness, he might bring an action to recover satisfaction for the injury done, contrary to law, under the statute.  And the same doctrine is laid down by the whole court, in Beckford v. Wood, 7 Term Rep. 616. Lord Kenyon says : the statute vests the right in authors for certain periods ; and within those periods, the act says, the author shall have the sole right and liberty of printing, &c. ; and the statute having vested the right in the author, the common law gives the remedy, by action on the case for a violation of it ; and that the act, by creating the penalties, meant to give an accumulative remedy.

The language in the statute of Anne, which is considered as vesting the right, is the same as in the act of congress.  In the former, it is considered as necessarily implied in the declaration that the author shall have the *sole right* during such time, &c.  And in the act of congress, there is the same declaration, that the author shall have the *sole right* of printing, &c. from the time of recording the title in the clerk's office.  The right being thus vested at the time, draws after it the common law remedy.  And there is no more reason for

contending, that the remedy given by the statute, supersedes the common law remedy under the act of congress, than under the statute of Anne. The statute remedy is through the means of penalties in both cases.

The term for which the copyright is secured in the case now before the court has not expired ; and according to the admitted and settled doctrine in England, under the statute of Anne, the common law remedy exists during that period.

Upon the whole, in whatever light this case is viewed, whether as a common law right or depending on the act of congress, I think the appellants are entitled to the remedy sought by the bill ; and that the decree of the court below ought to be reversed, the injunction made perpetual, and an account taken according to the prayer in the bill, without directing an issue to try any matter of fact, touching the right.

Mr Justice BALDWIN also dissented from the opinion of the court.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the eastern district of Pennsylvania, and was argued by counsel ; on consideration whereof, it is ordered, adjudged and decreed by this court, that the judgment and decree of the said circuit court, in this cause be, and the same is hereby reversed, and that this cause be, and the same is hereby remanded to the said circuit court, with directions to that court, to order an issue of facts to be examined and tried by a jury, at the bar of said court, upon this point, whether the said Wheaton, as author, or any other person as proprietor, had complied with the requisites prescribed by the third and fourth sections of the said act of congress, passed the 31st day of May 1790, in regard to the volumes of Wheaton's Reports, in the said bill mentioned, or in regard to one or more of them, in the following particulars, viz. whether the said Wheaton or proprietor did, within two months from the date of the recording thereof in the clerk's office of the district court, cause a copy of the said record to be published in one or more of the newspapers printed in the resident states, for four weeks ; and whether the

said Wheaton or the proprietor, after the publishing thereof, did deliver or cause to be delivered to the secretary of state of the United States, a copy of the same, to be preserved in his office, according to the provisions of the said third and fourth sections of the said act, and that such further proceedings be had therein, as to law and justice may appertain, and in conformity to the opinion of this court.